CLARENCE HOLLOWAY *v.* STATE OF MARYLAND

[No. 527, September Term, 1971.]

*Decided March 22, 1972.*

The cause was argued before ORTH, THOMPSON and POWERS, JJ.

*Howard L. Cardin* for appellant.

*James L. Bundy, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Leslie L. Gladstone, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

CLARENCE HOLLOWAY, convicted at a bench trial in the Criminal Court of Baltimore of making an assault upon Billy Anderson and sentenced on 7 May 1971 to 60 days accounting from 23 February 1971 would have us reverse the judgment on the ground that his prosecution was barred by collateral estoppel.

## I

The doctrine of *Benton v. Maryland*, 395 U. S. 784, under which the double jeopardy clause of the fifth amendment became applicable to the states, made more than of academic concern whether the basis of collateral estoppel was a constitutional one. The question was no longer whether it was a requirement of due process, see *Hoag v. New Jersey*, 356 U. S. 464, but whether the rule of collateral estoppel, long established in the federal criminal law, was embodied in the fifth amendment guarantee against double jeopardy. In *Ashe v. Swenson*, 397 U. S. 436, 445, the Supreme Court of the United States had no hesitation in holding that it was.

"Collateral estoppel", as defined in *Ashe*, "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." [1] Although collateral estoppel "stands for an extremely important principle in our adversary system of justice", ibid., the Court decided *Ashe* on the narrowest possible ground. Six poker players had been robbed by three or four armed men. Ashe was charged in separate counts with robbery of each of the players. He was tried on the charge of robbing one of the players and acquitted. He was then tried on a charge of robbing another of the players and convicted. The Court said, 397 U. S. at 446, "[The question] is simply whether, after a jury determined by its verdict that the petitioner was not one of the robbers,[2] the State could constitutionally hale him before a new jury to litigate that issue again." It held that collateral estoppel precluded the subsequent prosecution.

---

1. First developed in civil litigation, the rule became established in federal criminal law more than 50 years ago. Mr. Justice Holmes said in *United States v. Oppenheimer*, 242 U. S. 85, 87: "It cannot be that the safeguards of the person, so often and so rightly mentioned with solemn reverence, are less than those that protect a liability in debt." *Ashe*, at 443.

2. The Court found that the verdict of not guilty by the jury in the first trial could only have been because they believed Ashe was not one of the participants in the robbery. 397 U. S. at 446.

It seems that collateral estoppel will not often be available to a criminal defendant.[3] In most cases the defendant enters a general plea of not guilty and it is not often possible to determine with precision how the judge or jury has decided a particular issue. See *Unresolved Issues in the Law of Double Jeopardy: Waller and Ashe,* by Walter V. Schaefer, 58 California Law Review 391, 394 (1970). Others are in accord. Note, *Ashe v. Swenson, a New Look at Double Jeopardy,* 7 Tulsa Law Journal 68 (1971) states, at 73:

> "It may now be concluded as a practical rule that: (1) whenever an accused commits a multiple crime during the same criminal episode for which the prosecutor chooses to try him with a separate trial for each victim; and (2) the jury at the first trial acquits the accused finding the only conceivable issue in dispute in favor of the accused, then that issue once finally determined cannot be re-litigated in a subsequent trial against the accused."

The same thing is said in different words in Comment, *Criminal Procedure—Application of the Doctrine of Collateral Estoppel to State Criminal Proceedings,* 49 North Carolina Law Review 351 (1971), at 355:

> "[C]ollateral estoppel would be of no benefit to a defendant if (a) the first trial resulted in a conviction; (b) the conclusion of the jury could not be readily determined, as would be the case if Ashe had contested the issue of whether a robbery in fact took place as well as whether he was one of the perpetrators of it; or (c) the

---

3. And we cannot conceive that it would be available to the prosecution. As Mr. Chief Justice Burger pointed out in his dissent: "[C]ourts that have applied the collateral-estoppel concept to criminal actions would certainly not apply it to *both* parties, as is true in civil cases, i.e., here, if Ashe had been convicted at the first trial, presumably no court would then hold that he was thereby foreclosed from litigating the identification issue at the second trial." *Id.,* at 464-465 (Burger, C. J., dissenting) (footnote omitted).

issue decided in the first trial was not conclusive as to the offense in the second trial."

The few courts having occasion to consider collateral estoppel post *Ashe* are in accord. For example in *Ex Parte Billy Lee Johnson,* 472 S.W.2d 156 (Court of Criminal Appeals of Texas, 1971) the ruling was, at 157:

"With alternative ultimate facts outstanding, we cannot hold the doctrine of collateral estoppel applies."

See *Pulley v. Warden,* 431 F. 2d 258 (6th Cir. 1970).[4]

*Ashe* observed that "The federal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." 397 U. S. at 444. It pointed out what this approach requires:

"Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to 'examine the record of a prior proceeding, taking into

---

4. We note a possible significant future double jeopardy problem framed by Mr. Justice Brennan's concurring opinion and Mr. Chief Justice Burger's dissent. Mr. Justice Brennan's view was that "even if the rule of collateral estoppel had been inapplicable to the facts of this case, * * * the Double Jeopardy Clause nevertheless bars the prosecution of petitioner a second time for armed robbery." 397 U. S. at 449. This was because both offenses grew out of the same "criminal episode", and thus he was reading "same offense" to mean "same transaction." Thus any crimes arising from a single criminal act, occurrence, episode, or transaction should be treated as the same offense for fifth amendment purposes. The Chief Justice, in his dissent, however, interpreted the constitutional phrase "same offense" as embodying only the "same evidence" test. *Id.,* at 463. The "same evidence" test would not have prohibited the second prosecution of Ashe because additional evidence was needed to prove robbery of different property from a different person. We do not construe the opinion of the Court as adopting the "same transaction" standard. Nor did Mr. Justice Harlan in joining that opinion. He said, *id.,* at 448: "I wish to make explicit my understanding that the Court's opinion in no way intimates that the Double Jeopardy Clause embraces to any degree the "same transaction" concept reflected in the concurring opinion of my Brother Brennan."

account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.' The inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' *Sealfon v. United States,* 332 U. S. 575, 579, 68 S. Ct. 237, 240." [5] Ibid.

## II

The docket entries in the record before us show that a presentment was filed against Holloway in the Criminal Court of Baltimore on 22 February 1971 followed by the filing of indictment 752 on 26 February charging that on 11 November 1970 he did "* * * unlawfully make an assault upon, and did then and there beat the said Billy Anderson * * *." On 30 April the indictment came on for trial. The transcript of the proceedings discloses that on 30 April the State first called only one indictment, 749 of 1971 docket, and Holloway was arraigned. The Clerk informed him that under the indictment he was charged "with assault with intent to murder and also assault-common law" and asked his plea. Defense counsel said:

"If Your Honor please, as to that indictment, as to both counts of the indictment, the plea is not guilty and also a plea of double jeopardy. And by way of explanation, I might explain that Mr. Holloway did appear before His Honor, Judge Murphy, in Municipal Court of Baltimore City, in Western District, when all the charges that are before Your Honor, although the State

---

5. The Court noted that "Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal." Ibid. But these comments did not broaden the narrow grounds on which the decision was based.

is only calling one, and at his hearing before Judge Murphy, Judge Murphy dismissed all charges against Mr. Holloway. At the time when this case appeared before Judge Murphy, Mr. Holloway was charged with assault, I believe. That charge has since been raised to assault with intent to murder. I do understand, of course, that as far as assault with intent to murder is concerned, that that Court had no jurisdiction, and, therefore, its finding would not be binding on this Court. However, as to the second and lesser included offense, that of assault, it is the contention of the Defendant that if this Court is to find that the only, if in fact any, offense was committed, the only offense was assault, and Judge Murphy's ruling in dismissing the case would be binding on this Court and would, in fact, constitute placing the Defendant in jeopardy twice for the same offense, and, therefore, we would offer a plea of not guilty and also a plea of double jeopardy."

The Assistant State's Attorney remarked that it was "somewhat hampered by the fact we have an incomplete record from the Municipal Court." It added: "And further, that there was another assault case, that against Billy Anderson who is a member of the Baltimore Police Department attached to the Tactical Unit, and to the best of the knowledge of the State at this time, the indictment which the State has called for trial, the indictment 749, which charges that he did assault one Paul Fairbanks, who is the, one of the arresting officers in this case, was not before the Municipal Court to the best of our knowledge at this time." Defense counsel responded:

"If Your Honor please, pursuant of that contention, I would show to the State and offer for the Court's consideration a copy of the arrest register for the Defendant, Clarence Holloway, the victim's name being Paul Fairbanks, and

that is the same victim who is named in this particular indictment, and the charge is assault and attempted cutting, and I think, if Your Honor please, that this does constitute assault. I don't say that the Court is precluded from hearing the evidence on assault with intent to murder, but I think that the Court would have to find that if the only act that is shown that the Defendant did, in fact, commit, if he, in fact, committed anything, is assault, then this Court would be barred from ruling on the case, because it has, in fact, placed the Defendant in jeopardy twice for the same offense."

After a short recess the Assistant State's Attorney told the court there was "some question whether the judge below was sitting as a committing magistrate or trial judge" with respect to the assault on Fairbanks. So he called two other indictments, 752 and 753, as he had been "advised that [they] would not be subject to defense counsel's claim of double jeopardy, and I am prepared at this time to call those two indictments, all of which are alleging out of the same facts and circumstances * * *." Holloway was thereupon arraigned on those two indictments, 753 charging, according to the Clerk, that Holloway "did unlawfully carry upon and about his person a certain dangerous and deadly weapon, to wit: a butcher knife, on the 11th of November, 1970", that he was a rogue and vagabond, and that he "did unlawfully carry a weapon openly with intent to injure." The plea was not guilty and a court trial was elected. Defense counsel added:

"[B]efore we begin, so not to be precluded from filing preliminary motions, upon the statements of the State's Attorney calling this case to trial wherein he stated these cases all arose from the same facts and circumstances, we would move to dismiss all indictments based on the theory of collateral estoppel as stated by the

Court in *Ashe v. Swenson,* wherein the Court said that if certain cases are tried and other cases are not tried and they arose from the same facts and circumstances, then the State is collaterally estopped from calling those cases to trial at a later date."

The State told the court that the charges against Billy Anderson "were not brought at the Municipal Court level. * * * [T]his is the first time these charges have ever been brought * * *." And the charges regarding the weapon had "never been brought before * * *." The court withheld ruling on the motion to dismiss. At this point in the proceedings it was apparent that the State would proceed at that time to try only indictments 752 and 753, and that a pending motion to dismiss them on the ground that prosecution was barred by collateral estoppel was to be resolved at the trial of the general issue. No evidence had been offered on the motion.

As the rule of collateral estoppel in criminal cases requires the court to examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter so as to determine whether the trier of fact could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration, we look to the record here to see what evidence was adduced relating to the proceeding before the Municipal Court concerning Holloway. We examine the evidence adduced by the State as well as that adduced by the defense, observing, however, that as Holloway was the moving party in the motion to dismiss, it was encumbent upon him to produce proper evidence sufficient for the court to rule.

Officer Billy Anderson, after describing the incident on 11 November 1970 involving him, Officer Fairbanks and Holloway, said he had not been present in the Municipal Court when "some of the charges were before Judge Murphy"—"I was on a case in Criminal Court." On cross-examination it was brought out that the Municipal Court

proceedings had been postponed twice because a State's witness had not been present.

Officer Paul Fairbanks, after recounting what had occurred on 11 November was asked about the proceedings in the Municipal Court. He said he testified. He was questioned about the charges before the Court. The transcript reads:

"Q. [By Assistant State's Attorney] : And, the charges that were presented against the Defendant at that time, were—correct me if I'm wrong—larceny of the pocketbook, the radio and the butcher knife?

A. Yes, sir.

Q. And, assault by attempting to cut with that twelve-inch knife yourself?

A. Yes, sir.

Q. And, resisting arrest of yourself; is that correct?

A. Yes, sir.

Q. And those were the only three charges before Judge Murphy that you placed?

A. Yes, sir."

On cross-examination it was elicited that a preliminary hearing scheduled in the Municipal Court on 11 November 1970 had been postponed. About two weeks later it was again postponed and it may have been that it was postponed a third time. On each of these occasions a Theresa Dorsey, who had been involved in the incident resulting in the charges against Holloway, was not present. On 7 February 1971 the case again came up. The transcript of the examination of Fairbanks reads:

"Q. (By Mr. Cardin) [Defense Counsel] : There came a hearing on February 7th, 1971, and Judge Murphy threw the entire case out; isn't that right?

A. Yes, sir.

Q. And threw it out because he said it was too

dark for this man to tell whether or not you were police officers; isn't that right?

A. No, sir.

Q. Why did he throw it out?

A. He didn't explain. He just said, 'Dismissed.' MR. CARDIN: May I have the State's Attorney's file, please?

Q. (By Mr. Cardin) In any event, Judge Murphy threw the case out, right?

A. Yes, sir. * * *."

Q. When you testified before Judge Murphy, did you not give the same testimony you gave today?

A. Yes, sir.

Q. And, on that same testimony, Judge Murphy dismissed those charges; is that right?

A. There was no question as to the quality of the illumination; some other things—

Q. Officer Fairbanks, that is not my question. My question is, on the same testimony as you have just given in this court, Judge Murphy dismissed those charges; isn't that correct?

A. Yes, he dismissed them.

Q. And, if any assault occurred on you and occurred on Officer Anderson, they occurred at the same time within seconds of each other; isn't that true?

A. Yes, sir."

The State rested. Motion for judgment of acquittal was made, argued and denied. One of the points argued on the motion was that collateral estoppel barred the prosecution.

Holloway testified in his own behalf and gave his version of what occurred. He said he had appeared in the Municipal Court three times and "finally on February 7th * * * had a preliminary hearing" upon which the "case was dropped." Holloway said, "He throwed it out of court."

At the conclusion of Holloway's testimony the defense offered two exhibits. No. 1 was a copy of a pretrial conference report. It was admitted. It sheds no light on what occurred at the Municipal Court proceeding. No. 2 was designated by defense counsel as "a memorandum to the file from Joseph G. Koutz, part of the State's Attorney's file in this case." Objection to its admission was sustained. The transcript reads:

"MR. CARDIN: Your Honor, I think it is apparently the only record we have of what transpired at the preliminary hearing wherein the question still arises as to collateral estoppel, as to whether or not the issue was determined.

THE COURT: This record you are giving me is something written up by who? Mr. Koutz?

MR. CARDIN: By that side of the table.

THE COURT: He is only writing up a record of piece of paper as to hearsay that he heard which took place at that hearing. This is strictly —

MR. CARDIN: As long as my proffer is offered, I'm satisfied.

THE COURT: It is hearsay upon hearsay.

MR. CARDIN: Very well.

MR. GLADSTONE [Assistant State's Attorney]: I have no objection to counsel offering the entire record of Municipal Court that exists as to this matter.

MR. CARDIN: Obviously there is no record.

THE COURT: Do you have the record?

MR. CARDIN: Of course not."

The defense recalled Officer Fairbanks and adduced that at the time of the encounter with Holloway, both Fairbanks and Anderson were in uniform but Fairbanks was wearing a raincoat while Anderson was not. Then the Court inquired:

"THE COURT: Is it my understanding that at-

the preliminary hearing the Judge made a statement that he was dismissing the case due to the fact that he did not feel that the Defendant knew that you were police officers because the condition was so dark that he could not tell who he was fighting with; is that correct? THE WITNESS: Mr. Kaplan [counsel for Holloway] made a comment to that effect. He had asked me what time was it, and I said it was 1:10 in the morning. He said it was dark outside, and I replied, without thinking, yes, by nature of night and day it was dark, and they didn't ask any further questions as to illumination, and then Mr. Kaplan and the Judge had a discussion, and the Judge dismissed the case."

A motion for judgment of acquittal was made and denied. After extensive argument on the merits the court found Holloway guilty under indictment 752, "assault on Officer Billy Anderson" and under the fourth count of indictment 753, "carrying a weapon openly with intent to injure." Implicit in the verdicts was a denial of the motion to dismiss the indictments. At a subsequent hearing on a motion for a new trial it cannot be ascertained from the transcript whether the ultimate ruling of the court was a grant of a new trial as to indictment 753 or a grant of a motion to dismiss it "because of collateral estoppel;" it apparently did both. In any event the verdict under indictment 752 stood. It seems that thereafter a nolle prosequi was entered as to all other outstanding indictments concerned with the incident.

On the state of the record before us we cannot say as a matter of constitutional fact, see *Ashe v. Swenson, supra,* at 443, that the prosecution of Holloway under indictment 752 on the charge of assaulting Billy Anderson was barred under the doctrine of collateral estoppel. We are not even able to determine the nature of the proceeding in the Municipal Court, whether it was a preliminary hearing upon which Holloway was not bound

over for the grand jury or whether it was a trial on such charges as were within that court's jurisdiction. If it were such a trial the record does not show with sufficient specificity what charges were before the court. And assuming that verdicts of not guilty were rendered on such charges as were before that court, we cannot ascertain that the verdicts were rendered without alternative ultimate facts outstanding. That is, we are unable to conclude from the record that a rational trier of fact could not have grounded its verdict upon an issue other than that which Holloway seeks to foreclose from consideration, for among other reasons, because of our view that the opinion of the Court in *Ashe* does not adopt the "same transaction" concept. In other words, the record does not fairly establish that the issue decided in the Municipal Court, whatever it may have been, was conclusive as to the offense in the trial before the Criminal Court of Baltimore. The short of it is that Holloway did not produce sufficient evidence to support his motion to dismiss and such evidence did not otherwise get into the record.[6] We hold that the lower court did not err in denying the motion to dismiss indictment 752.

## III

Holloway also contends that the evidence was not sufficient to support the conviction. This contention is bottomed on the claim that the only conclusion from the evidence adduced was that "because of the darkness, the rain, the dress of the officers and the position of Officer Anderson," Holloway did not know that two persons accosting him were police officers." It follows, he asserts, that "his conduct was that of a reasonable and prudent

6. We observe that defense counsel told the lower court that "the only record we have of what transpired at the preliminary hearing" was the memorandum from the State's Attorney's file. The court excluded that document and Holloway does not now claim that its exclusion was error. We think that what transpired in the Municipal Court could have been established with more particularity. For example, there was no explanation why the docket and such other records kept by the Municipal Court pertaining to the matter were not produced, or why the Municipal Court judge was not called to testify.

man under all the circumstances and did not constitute a criminal act."

Holloway testified that he had been released from prison on 10 November 1970 with money earned on work release, $100 cash and a $300 check. He met a woman on a corner and she agreed to have sexual intercourse with him for $10. He bought whiskey and they went to her apartment at 1315 W. Fayette Street. Before the agreement was fulfilled, but after the fee had been paid, she left while he was in the bathroom. She had taken the whiskey and left her pocketbook. After waiting awhile, it dawned on him that he had been tricked. There was a knife in her pocketbook and he took it and went out the front door. "That's where them two officers met me at the door. I start by them; they grabbed me by the belt." He did not know they were officers "till I got my glasses on I noticed the badge. Then I handed him the knife. * * * I put my glasses on right after he grabbed me in my belt, and I switched around with the knife like this." On cross-examination he said he also took the pocketbook with him to give it to the first policeman he saw so he could get his $10 back. He denied giving the officers "a hard time" at all. The transcript reads:

"THE COURT: Are you telling me now that when you came down the steps, you were glad to see these two officers?
THE WITNESS: I was.
THE COURT: And you knew they were officers?
THE WITNESS: I didn't know nothing until I had got my glasses and put my glasses on and saw his badge up on the cap.
THE COURT: How could you be glad to see them because they were police officers if you didn't know they were officers?
THE WITNESS: Your Honor, after I got straightened up and looked up and saw his badge on his head, I was really glad to know they were policemen.

THE COURT: When did you put your glasses on?

THE WITNESS: After I come out the door and I had my glasses in my pocket, I had my glasses in my pocket then, I got my glasses and put them on, I recognized it was officers after I saw the badge on his hat.

THE COURT: You say you didn't have a knife in your hand?

THE WITNESS: Yes, sir, I had this knife in my hand.

THE COURT: You had a knife in your right hand, pocketbook in your left hand. How did you put the glasses on?

THE WITNESS: Yes, sir.

THE COURT: With which hand did you put the glasses on?

THE WITNESS: I took—my glasses in this pocket. I took my glasses, put my glasses, opened up, put them on my face.

THE COURT: What did you do with the knife?

THE WITNESS: I had the knife in my hand. I got my glasses and opened my glasses up, put my glasses on, and I recognized he was an officer. I recognized by his badge, and I was glad to see him. I said, told him, 'Officer, go in,' and he holding me by my belt, 'Go in there and get my money from the lady in there that taken my money.'

THE COURT: When did you put your glasses on? I understood immediately, when the two of you came together; in other words, you put your glasses before the two of you came together?

THE WITNESS: No, sir, my glasses was in my pocket, Your Honor.

THE COURT: With the right hand?

THE WITNESS: I had this knife, I got my glasses, I got my glasses out, and took my

glasses and put my glasses on; that's when I recognized he was a police officer by his badge on his cap.

THE COURT: Then you knew when the officer was holding you that he was an officer?

THE WITNESS: When he was—after he grabbed me in my belt.

THE COURT: Why did you kick?

THE WITNESS: I don't remember kicking him, Your Honor, to tell you the truth. I really don't. Indeed, I didn't do it, it was an accident."

Anderson testified that about 1:10 a.m. on 11 November 1970 he received a complaint from a citizen that "there was a lady at 1315 West Fayette Street who was having trouble with her boy friend and he refused to leave." In a marked radio car, he went to the address with Officer Paul Fairbanks. He saw a woman standing between the premises 1315 and 1317. "She was standing there in what appeared to be night clothes." She pointed to Holloway who was coming down the steps of 1315 and said, "That's him." Anderson saw Holloway "carrying what appeared to be a lady's purse and another object in his right hand at this time, and a knife in his left hand, a butcher knife." "At this point Officer Fairbanks was in front of me; the Defendant lunged towards him with the knife; Officer warded off the blow of the knife with the blow of his stick on the Defendant's arm. I grabbed the Defendant around the back and under the arms and held him and as I was holding him, he was attempting to get away by kicking me on the shins. * * * He did kick me on the shins." The woman was Theresa Dorsey and the knife, about 12 inches long with a black handle, belonged to her. Anderson described the scene of the incident:

"There is a street light on the northwest corner of Calhoun Street which I have marked as approximately two hundred feet to 1315 West Fayette. There is a street light directly

"across the street from 1315 West Fayette, approximately sixty-five to seventy-five feet. There is a street light on the northwest corner of Carey and Fayette approximately one hundred and twenty-five feet from 1315 West Fayette; and there is a street light between 1323 and 1321 West Fayette, approximately one hundred feet from 1315 West Fayette."

Although it was raining the lighting conditions were "very good", the street lights being "mercury vapor lamps."

We find that this evidence was sufficient in law to sustain the conviction of assaulting Anderson. *Williams v. State,* 5 Md. App. 450. Therefore the judgment of the lower court on the evidence was not clearly erroneous and we may not set it aside. Maryland Rule 1086.

*Judgment affirmed.*