JUDITH RHODA GRAY *v.* STATE OF MARYLAND

[No. 274, September Term, 1974.]

*Decided December 18, 1974.*

The cause was argued before GILBERT, MENCHINE and DAVIDSON, JJ.

*Joseph M. Bryan, Assigned Public Defender,* with whom was *Edward P. Camus, Public Defender for Prince George's County,* on the brief, for appellant.

*Gary Melick, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *John B. Wynes, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

MENCHINE, J., delivered the opinion of the Court.

Judith Rhoda Gray was indicted by the Grand Jury of Prince George's County under a single, six count indictment charging the following offenses:

| | |
|---|---|
| *First Count:* | That on October 16, 1972 she did murder Michelle Mulkey; |
| *Second Count:* | That on October 16, 1972 she did assault and beat Michelle Mulkey; |
| *Third Count:* | That on November 20, 1972 she did assault and beat Diedra Prophet, a minor child 23 months of age; |
| *Fourth Count:* | That on November 20, 1972 she did assault Diedra Prophet; |
| *Fifth Count:* | That on December 11, 1972 she did murder Kimberly Bush; |
| *Sixth Count:* | That on December 11, 1972 she did assault and beat Kimberly Bush, a minor child 6 months of age. |

Appellant filed a motion for separate trials, alleging, *inter alia,* that the counts dealt with separate and distinct situations as to victim, time and place; that the offenses were unrelated; and that they were not the result of a continuous transaction. The petition maintained that it would be prejudicial to be required in a single trial to defend three separate, distinct and unrelated offenses. An order granting the motion was passed by the Circuit Court for Prince George's County providing that "separate trials be granted to the defendant as to counts 1 and 2, counts 3 and 4,

and counts 5 and 6." A plea of not guilty by reason of insanity was filed as to all counts.

On September 17, 1973 trial as to counts 3 and 4 was begun before Judge James H. Taylor. At the conclusion of that trial on September 19, 1973, the trial judge rendered a verdict of not guilty by reason of insanity.

On January 28, 1974, by agreement of counsel, remaining counts 1, 2, 5 and 6 came to trial before Judge William H. McCullough. A motion was filed to dismiss all such counts upon the ground that the prior verdict of not guilty by reason of insanity in the first trial barred further prosecution of the accused. Ruling on the motion was reserved. At the conclusion of the trial on February 1, 1974 the motion to dismiss was denied and a verdict of guilty of second degree murder under counts 1 and 5 was rendered, the court declaring that the offenses charged by counts 2 and 6 were merged. Appellant was sentenced to a term of imprisonment of twelve years under count 1 and to a consecutive sentence of twelve years under count 5.

The questions presented by the appellant may be thus summarized:

1. Was appellant denied due process of law with respect to the use of a confession?
2. Did the verdict of not guilty by reason of insanity at the first trial operate as a final judgment barring relitigation on the issue in a second trial?
3. Was the court's decision finding the appellant to be sane, beyond a reasonable doubt, clearly erroneous?
4. Did the evidence presented in this case reduce the offense charged to manslaughter?

### 1. *The Confession of the Accused*

On July 11, 1973, (prior to the first trial on counts 3 and 4) Judge Taylor had conducted a preliminary hearing on a motion to suppress three statements made by the accused.

At the conclusion of that hearing, Judge Taylor had denied the motion as to statements 1 and 2, but granted the motion as to statement 3.[1] On November 8, 1973 Judge Taylor, (subsequent to rendition of the verdict of not guilty by reason of insanity in the first trial under counts 3 and 4) concluding that he erred in his prior ruling, found that statement 3 also was admissible in evidence. Appellant questions the propriety of that action. No issue stemming from that decision is before us. The record of the subject trial before Judge McCullough shows that a new hearing was conducted upon the issue of the admissibility of statements 1 and 3 (the only two offered in the course of the second trial). He had a clear right to follow such a course in spite of a decision on the issue by another judge. *Walker v. State,* 12 Md. App. 684, 280 A. 2d 260. Statement 1, relating to the death of Kimberly Nicole Bush, was admitted without objection. We have examined the record with respect to the admission of statement 2, relating to the death of Michelle F. Mulkey, and find that Judge McCullough's decision that the same was admissible is firmly supported by competent evidence.

## 2. *Effect of Prior Acquittal*

Appellant contends that the special verdict of not guilty by reason of insanity under counts 3 and 4 in the first trial operates to bar relitigation of the sanity of the accused in the second trial under the doctrine of *res judicata* or collateral estoppel. We do not agree.

Early decisions summarily rejected contentions that a verdict of not guilty by reason of insanity as to one offense operated as a bar to prosecution of the accused for contemporaneous offenses against other victims. Examples of such cases are: *Hotema v. U. S.,* 186 U. S. 413 (1902) and *People v. Cygan,* 200 N. W. 967 (S. Ct. Mich. 1924). In *Hotema* the accused had been found not guilty by reason of

---

1. Statement 1 dealt with victim Bush (counts 5 & 6 of the indictment); Statement 2 dealt with victim Prophet (counts 3 & 4 of the indictment); Statement 3 dealt with victim Mulkey (counts 1 & 2 of the indictment).

insanity in the killing of two persons. At a trial of the accused for the murder of a third person on the same day, a special plea that he had been once placed in jeopardy was filed by the accused. The Supreme Court rejected the special plea, saying at 422:

"While the plea, on such facts, is wholly without merit, and need not be further noticed, it is only adverted to for the purpose of recognizing the fact that the defendant has been charged with the murder of three different persons on the same day, and that seemingly there was no motive shown for the killing of any of them, or, at any rate, there was none shown for the killing of the person described in the indictment in this case, as the charge of the court in substance concedes. It also appears in this record that the first jury impaneled in this case was unable to agree upon a verdict. We are thus made acquainted, from the record, with the fact that one jury, upon the question of the insanity of the defendant, has, upon the trial of the consolidated indictments charging him with two distinct and separate murders, acquitted him of the alleged crimes on that ground; another jury has been unable in this case to agree upon the question; a third one has, in the case now before us, convicted him. Being unable to see any legal error committed by the trial court we are bound to affirm the judgment."

The current validity of those summary decisions may be doubted. In *Benton v. Maryland*, 395 U. S. 784, the double jeopardy clause of the Fifth Amendment was made applicable to the states through the Fourteenth Amendment. Recognition of collateral estoppel as a constitutional right followed closely with the decision in *Ashe v. Swenson*, 397 U. S. 436. In *Holloway v. State*, 14 Md. App. 703, 288 A. 2d 652, this Court discussed the meaning and effect of the decisions in *Benton* and *Ashe*, both *supra*, and outlined the procedures by which determination of the

existence *vel non* of collateral estoppel should be made. In *Holloway* we said at 711 [656]:

> "As the rule of collateral estoppel in criminal cases requires the court to examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter so as to determine whether the trier of fact could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration, we look to the record here to see what evidence was adduced relating to the proceeding * * *."

*State v. Sanders,* 229 So. 2d 288 (Dst. Ct. of App. 1st Dst. Fla. 1969), although citing excerpts from *Hotema* and *Cygan,* both *supra,* with approval, went on to consider whether a verdict of not guilty by reason of insanity served to bar a subsequent prosecution for the contemporaneous murder of another victim under the doctrine of *res judicata* or collateral estoppel. That Court utilized much the same procedures for the determination as did this Court in *Holloway, supra.* In *Sanders* the trial court had dismissed the second indictment upon the ground that: (P. 289)

> "* * * the jury could not have reasonably rendered their verdict upon any other basis than a determination by them that the defendant was insane at the *time* and *place, when* and *where,* both [victims] was killed, * * * and therefore * * * necessarily found and concluded that the defendant was insane at the time of the homicide in the instant case * * *."

The Appellate Court then said at 290:

> "we too must go to the record in said [former] case, * * *, and analyze the testimony and evidence in order to show wherein we feel that the matter of the homicide of [the second victim] has not been litigated nor has the sanity or insanity of the

defendant at the alleged time of the killing * * * been necessarily concluded and become res judicata."

After declaring (P. 290) that the court did "not feel that the testimony of the psychiatrists need be analyzed for the purpose of decision," the Appellate Court detailed at some length the testimony of the accused himself during the course of the second trial and then stated: (P. 292)

"In the case of sub judice, we have two alleged homicides — occurring on the same date, but no one knows how closely together they occurred except the defendant. No element of the homicide of the Granger girl was necessary to a trial for the homicide of the Wood girl. All we know is that the Wood girl was the first one shot and the doctors' testimony was that the bullet entered one side of her chest and came out the other. Was she killed instantly by this shot? Who knows? Was it afterwards, after the homicide of Miss Wood that the defendant lost his mind? Who knows? There are too many unanswered and frankly, unasked questions for the rule of res judicata, double jeopardy or estoppel to apply."

### Examination of the Record in the Subject Case

At the first trial, Judge Taylor, in announcing his verdict in the trial of the third and fourth counts of the indictment, found that the State had proved the elements of the offense charged beyond a reasonable doubt. He then recapitulated the testimony bearing upon the sanity *vel non* of Judith Rhoda Gray and declared his conclusion based upon that evidence in the following language:

"Now, it certainly is not to say that any person who commits an irrational act at a given time, without any explanation of it, is insane, *and it does not say that through the periods of time as mentioned in this indictment that Mrs. Gray was insane,* but it

> does say that the State has not shown beyond a
> reasonable doubt that Mrs. Gray was sane on the
> 20th of November, at the time that she committed
> the offense for which she is charged. So, in light of
> that, I have got to find her not guilty by reason of
> insanity * * *." (Emphasis added.)

Thus, there was a direct rejection by the trial judge that his decision in the first trial did or could determine the sanity *vel non* at other times than the date upon which those offenses had been committed. This alone would demonstrate that such decision could not operate as *res judicata* or collateral estoppel as to the sanity of the accused on other dates.

Evidence from the lips of the psychiatrist called by the defense further demonstrates that the doctrine can have no application here. Examples are:

> "Q What about what had gone on in
> October-December, 1972?
>
> A We also went over that ground again. She also
> was able to talk about Spring Grove. Then
> between the first time I saw her and July at —
> I really had not particularly intended to see her
> again. I saw her when Mr. Bryan called me and
> raised the question about competency. And I
> went to see her and at that time she was again
> emotional, distraught, et cetera, but I felt she
> was competent.
>
> * * *
>
> A * * * schizophrenic reactions can be, they can
> come and go. They can be fleeting in nature.
> One can exhibit some of the symptoms, part of
> the symptoms, none of the symptoms at
> various times. It was demonstrated, for
> example, during the course of World War II,
> the Korean War, the war in Vietnam, that
> anyone could become schizophrenic. For

example, under sufficient stress it was known when people spent a sufficient time in combat that they could then have acute schizophrenic reaction which might be transient in nature, which might be repetitive in nature, they could exhibit various of the symptoms of schizophrenia, et cetera.

\* \* \*

Q Doctor, I noticed in there you read a passage where she said she had considered suicide but didn't have the guts for it, is that correct?

A That is what she said.

Q Does that indicate to you a certain amount of judgment, reasonable judgment, ability to judge?

A I don't think that Judith Gray has at all times been devoid at all times of ability to judge things.

\* \* \*

A I have to, again, say that I think it may be very difficult for lay people to understand that somebody is either not crazy — it is not a black and white thing — that somebody is either crazy or they are not. It is a very subtle process in which there are varying states of consciousness, varying states of judgment, varying times when they will exhibit these four A's that we are talking about, and it is a continuum as is indicated in these studies in schizophrenia; it is a subtle process."

We have no difficulty in concluding from this record that the prior verdict of not guilty by reason of insanity did not give rise to "collateral estoppel" — "the principle that bars relitigation between the same parties of issues actually determined at a previous trial." *Ashe, supra,* 397 U. S. at 442, 90 S. Ct. at 1193. The first verdict here did not, as it did

in *Ashe*, resolve "[a] single rationally conceivable issue in dispute," that controlled decision in both trials. The record makes clear that the verdict of Judge Taylor in the first trial was restricted to the issue of the sanity *vel non* of the accused on November 20, 1972. The evidence at the second trial shows that such decision was not dispositive of the question of her sanity on October 16, 1972 or December 11, 1972, the dates of the subject offenses. Prosecution of those offenses was not barred by collateral estoppel.

### 3. *The Evidence of Sanity*

Appellant's contentions with respect to the insanity defense essentially amount to a claim that the medical witness offered by the defense was so sound in his views, and the medical witnesses offered upon the issue by the State so unsound, that the decision to accept the latter was clearly erroneous. At the conclusion of testimony and arguments of counsel, Judge McCullough delivered an oral opinion that included a most careful summary of all of the evidence that bore upon the sanity of the accused. We shall quote the following pertinent parts of the conclusion he reached:

> "Turning to the insanity defense, the Court notes that our procedural law requires a presumption that the defendant was responsible for criminal conduct and sane at the time of such conduct until, after the filing of a proper plea, there is adduced proof that she lacked substantial capacity either to appreciate the criminality of her conduct or to conform her conduct to the requirements of law, as a result of a mental disorder. This proof need only be sufficient to raise a doubt as to her sanity as defined in the minds of reasonable men in order to overcome the initial presumption of sanity. The burden then shifts to the State to prove sanity as well as the other elements of the offense beyond a reasonable doubt.
>
> "The Court feels that the initial presumption of

sanity was easily overcome by the testimony of the defendant's psychiatric witness, Dr. Lanham.

"Dr. Lanham testified at length to his qualifications and the Court has no reason to doubt that he is an eminent psychiatrist, a specialist in his field, and board certified.

"He testified that he had performed a comprehensive psychiatric evaluation to determine whether or not the defendant suffered from a mental disorder that met the Maryland statutory test.

\* \* \*

"I do not question Dr. Lanham's qualifications. I do question the manner in which he went about this interview of the defendant, and I question the basis on which he lays his conclusion of schizophrenic reaction, latent type."

After summarizing the testimony of two lay and three medical witnesses offered by the State in rebuttal of the insanity defense, Judge McCullough declared:

"As the Court earlier said, the testimony of Dr. Lanham overcame the presumption of sanity. This, of course, required the State then to go forward with testimony in an attempt to convince the Court beyond a reasonable doubt that the defendant was in fact sane at the time of the commission of these offenses or, as is stated in the statute, that the defendant did not have a mental disorder so as to lack substantial capacity either to appreciate the criminality of her conduct or to conform her conduct to the requirements of law.

"The Court has very carefully considered Dr. Lanham's testimony on this point and has tried to record his testimony almost verbatim as he gave it. And, without casting any reflection on the doctor's competence, the Court feels that his conclusion was erroneous.

"The Court finds that the evidence produced by the State is, and the Court is convinced beyond a reasonable doubt, that this defendant's conduct was a result of a mental disorder, but that the mental disorder did not affect her acts to the extent that she lacked the substantial capacity to appreciate the criminality of her conduct or to conform her conduct to the requirements of the law."

We have examined the record and find that there was substantial evidence to support the conclusion reached by the trial judge. We cannot find that his decision was clearly erroneous. Rule 1086.

### 4. *Sufficiency of the Evidence of Murder*

Appellant's contention that the evidence established no more than manslaughter is wholly without merit.

Dr. Irwin M. Sopher, Deputy Chief Medical Examiner for the State of Maryland, gave the following testimony concerning his post mortem examination of Michelle Mulkey:

"THE WITNESS: Yes. As indicated in red this would be the area of skull fracture as noted in the post mortem examination.

BY MR. WYNES:

Q Doctor, what was the length of that fracture?

A Approximately 6 inches in total.

Q Doctor, what can you tell the Court regarding the strength of the skull of a 9 month old infant? How does this compare to the strength of the skull, say, of an adult?

A Well, the infant's skull, due to the fact that the bones are not totally fused, is more flexible than that of an adult. That is to say, in broad terms, that given the same force applied to the same area in an adult skull it would require more force to inflict injury on a child's skull.

The child's skull in general is more resistant to injury than would be the adult skull.

Q Does the length of the fracture in this case tell you anything regarding how the injury was sustained, what it was caused by?

A There is a suggestion that an object was used.

MR. BRYAN: Objection.

THE COURT: Objection overruled.

A suggestion that an object was used?

THE WITNESS: Yes. One cannot be definite. That is to state that a pipe or a table leg versus a fist was used to impart the injuries, it is difficult to say with any degree of certainty.

BY MR. WYNES:

Q Could it have been any of those three?

A Yes, definitely.

Q What about the injury to the liver, the tearing at the liver?

A Yes. This, again, could be due to a blunt force object such as a baseball bat or table leg or a fist. It would be compatible with the injury.

Q Doctor, what about the rib fractures that you observed?

A Yes. Again a blunt force injury, application of pressure to the chest either from a fistlike blow or a blunt object, we mentioned, would be appropriate here.

Q Could they have been caused by attempts at closed heart massage?

A Yes, they could have, definitely.

Q How about the bruises?

A Not the bruises of the head, certainly, not the bruise or either bruise of the belly, in the front of the belly. If closed heart massage, that is, compression of the chest in resuscitation, were employed you would find bruises of the chest

and not of the belly. The bruises in this instance were of the belly and of the lower left hip area as well as about the head. Of course these would not be seen in closed chest massage."

Dr. James L. Luke, Chief Medical Examiner of the District of Columbia, gave the following testimony concerning his post mortem examination of Kimberly Bush:

"Q Would you tell us, if you would, the pertinent findings as a result of that autopsy?

A The body was that of a well-developed, well-nourished black female infant, appearing the stated age of six months. The pertinent findings included the following: There was confluent or difuse hemorrhage that was found underneath the mucous lining of the eyes. This sort of abnormality is consistent with blunt force impact.

There was evidence of hospital intervention in terms of a surgical cutdown incision in the right ankle. There were multiple vena puncture wounds, or needle puncture wounds consistent with her hospital intervention.

In addition there were fractures of the right ribs 9 through 11 and of the left ribs 7 and 8 at the vertebral margin, or the back portion of those ribs, with corresponding hemorrhage. The ribs were fractured internally. In other words, the force came from the back towards the front.

And in addition to that there were in-line fractures of right ribs 4 through 9 at the midaxillary line.

Q Where is that?

A The mid portion of the thorax.

\* \* \*

On examination of the scalp it revealed difuse, fresh hemorrhage of the scalp and underneath the scalp that involved the left parietal or occipital region, or the left side and back of the head. Underneath this hemorrhage was a 12.4 centimeter, or approximately 8 inch, ragged linear fracture which traversed the outside portion of the skull in a horizontal fashion.

\* \* \*

Q What can you tell us about the quality of the skull of an infant of that age that is six months old in terms of strength, that sort of thing?

A Well, it is extremely fibrous. Of course, it has not been formed into bone yet. It is quite resilient and flexible and has much the consistency of celluloid or — the old icing glass [sic] that was in automobile windows some time ago. It is very strong.

\* \* \*

Q Doctor, how does its strength or quality relate to those of an adult skull?

A Well, it is more flexible and more fibrous and I guess an analogy would be an adult skull is more easily cracked. To generate a factor [sic] like this would require considerable force in a child of this age with a skull that is flexible.

\* \* \*

Q Doctor, did you form an opinion, based upon a reasonable degree of medical certainty, as to the cause of the various rib fractures?

A Well, I can tell you about the rib fractures parallel to the vertebral column in the back, and these resulted from force applied to the back, directed toward the front of the body.

Q Doctor, based on your training and experience

are you familiar with what is known as closed heart massage?

A Yes.

Q Can you tell us what that is, how it is applied?

A This is compression of the front of the chest in an effort to, repetitive compression in an effort to stimulate the pumping of the heart to circulate the blood.

Q Where is that applied, that pressure?

A In the front lower portion of the chest.

Q Now, were you able, after the autopsy in this case and based upon your experience, to form an opinion, within a reasonable degree of medical certainty, as to whether or not those rib fractures at the back could have been caused by the application of closed heart massage by a medical doctor?

A Yes.

Q What was that opinion, Doctor?

A They are inconsistent with having been caused by closed heart massage."

Thus the evidence clearly shows that both victims sustained multiple injuries caused by the application of great force by a blunt object. Suggestions that such injuries could be the result of accidental falls were expressly rejected by competent medical evidence as to both.

In *DeVaughn v. State,* 232 Md. 447, 194 A. 2d 109, it was said at 456 [114]:

"Where the law, as in Maryland, divides murder into grades, there is a presumption that the homicide is murder in the second degree * * *."

Appellant contends, however, that the evidence showed circumstances of alleviation or mitigation sufficient to rebut the presumption that all homicides are committed with malice aforethought. The trial judge had before him all factors suggesting such alleviation or mitigation and chose

to reject them. We cannot say his action was clearly erroneous. Rule 1086. This case is quite easily distinguishable from that of *Whitehead v. State,* 9 Md. App. 7, 262 A. 2d 316, wherein a conviction for second degree murder was reversed by this Court. In *Whitehead,* we said at 13 [320]:

> "We do not feel that the evidence showed beyond a reasonable doubt that appellant sought the occasion or provoked the difficulty for the purpose of killing the deceased, nor was there a deadly weapon used by him. It did not appear that the deceased was beaten to death. Although the evidence was sufficient to prove that appellant's acts were the proximate cause of the death, as from an intentional blow which the lower court found was struck by appellant, knocking deceased to the ground, it did not show that the killing was the direct result of a blow or blows struck by appellant. The autopsy findings were that the deceased died 'of cranio-cerebral injuries consistent with a fall' and the manner of death was stated as 'undetermined.' "

In the subject case the cause of death was stated as "homicide" and the injuries were declared to be inconsistent with a fall. The criminal agency of the defendant is not contested here. The evidence was legally sufficient to convict the appellant of murder in the second degree as to both victims.

*Judgments affirmed.*