465 So.2d 598 (1985)
Diosdado NACHER, Appellant,
v.
The STATE of Florida, Appellee.
No. 83-271.
District Court of Appeal of Florida, Third District.
March 19, 1985.
*599 Bennett H. Brummer, Public Defender and Howard K. Blumberg, Asst. Public Defender, for appellant.
Jim Smith, Atty. Gen. and Richard L. Polin, Asst. Atty. Gen., for appellee.
Before SCHWARTZ, C.J., and HUBBART and FERGUSON, JJ.
SCHWARTZ, Chief Judge.
The defendant appeals from judgments imposed after a jury rejected his insanity defense  which was the only question in dispute  and found him guilty of two counts of armed robbery during a gas station holdup at midnight of May 29, 1980. Another jury had previously found him not guilty by reason of insanity of an attempted first degree murder which occurred at 3:00 a.m. on May 30, 1980, when he shot at a police officer who was trying to apprehend him for the earlier robberies. His sole contention here is that the acquittal established his insanity at the time of the earlier offense under the collateral estoppel doctrine adopted as a double jeopardy-constitutional principle in Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). We affirm.
Ashe sets out the route and the object of our inquiry. We must
with realism and rationality ... `examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'
397 U.S. at 444, 90 S.Ct. at 1194 (quoting Mayers & Yarbrough, Bis Vexari: New Trials and Successive Prosecutions, 74 Harv.L.Rev. 1, 38-39 (1960)); see also Gragg v. State, 429 So.2d 1204, 1206 (Fla. 1983), cert. denied, ___ U.S. ___, 104 S.Ct. 83, 78 L.Ed.2d 93 (1983); Alvord v. State, 322 So.2d 533 (Fla. 1975), cert. denied. 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976). Since the issue here is Nacher's sanity during the May 29th crimes, we must under this formulation determine whether the conclusion of the first jury[1] *600 that he was insane 27 hours later carries with it the inevitable conclusion[2] that he was also insane during the earlier episode. We find to the contrary.
It is true that both the defense psychiatrist and psychologist[3] based their conclusions that Nacher was insane during the May 30th crime on what they concluded were conditions  involving schizophrenia and an "organic brain syndrome" aggravated by chronic drug abuse  of a long standing duration, dating back to before his arrival in the Mariel boatlift, and certainly in existence more than the 27 hours which elapsed between the two incidents. But there was also evidence, which is decisive in our view, both that his condition was subject to being triggered by his ingestion of drugs on particular occasions[4] and that he had in fact taken narcotics the night of the May 30th shooting[5]  and thus after the May 29th robberies had already taken place.[6] In addition, defense counsel *601 insisted that the nature of his conduct during the attempted murder indicated his insanity that night. He stated in final argument
in the stipulation Mr. Nacher twice, during the chase, he drives the car, he sticks his head out the window, he turns around and he fires several times at the car chasing him. Now, are those the actions of a man concerned with the consequences of his behavior? Are those the actions of a man aware of the crime? Driving in a car he lets go of the wheel and turns around? That is reasonable doubt number two.[7]
The acceptance of this evidence and argument, which related peculiarly to the May 30th incident, might well have led the jury to believe that the drugs taken by Nacher before it occurred had temporarily exacerbated a long-standing mental condition, see Cochran v. State, 65 Fla. 91, 61 So. 187 (1913), and that he was therefore insane during the attempted murder  which was the only issue before it. Such a finding indicates nothing at all as to his condition during the events of the night before, about which there was no evidence and of which the jury was consequently totally unaware.[8] Since, as Ashe says, see also Gragg v. State, supra, the jury therefore rationally "could"[9] have reached its verdict on a basis which did not include the finding that Nacher was insane on May 29th, his contention cannot prevail. See State v. Munro, 462 So.2d 484 (Fla. 5th DCA 1984).
This conclusion is supported by several cases in which it has been held that when, as here, there is an evidentiary basis to separate the two, a determination that the defendant was insane during a later crime does not foreclose a contrary finding as to a previous one  even one which occurred a very short time before. See State v. Sanders, 229 So.2d 288 (Fla. 1st DCA 1969) (collateral estoppel inapplicable because of indication that defendant's "mind snapped" during hour between two murders; compare Rawls, J., dissenting on ground that medical testimony as to two homicides "not capable of being separated," 229 So.2d at 299); People v. Kernanen, 178 Colo. 234, 497 P.2d 8 (1972) (insanity finding in second robbery no collateral estoppel as to robbery three hours earlier "although it is highly improbable that defendant was not suffering from the same incapacity."); see also Gray v. State, 23 Md. App. 700, 329 A.2d 751 (1974) (insanity as to November 20th murder not conclusive as to homicides on October 16th or December 11th).
On the other hand, the cases cited by the appellant are either of little assistance, State v. Powell, 314 So.2d 787 (Fla. 2d DCA 1975) (upholding, without factual detail, collateral estoppel effect of insanity acquittal to other crime during same episode), or, by virtue of their distinguishing characteristics, actually serve to demonstrate the correctness of the present result. Thus, in State v. Nagel, 87 N.M. 434, 535 P.2d 641 (Ct.App. 1975), cert. denied, 81 N.M. 450, 535 P.2d 657 (1975), the court held that the defendant's insanity acquittal barred his trial on related charges which occurred sixteen hours before. This holding, however, was entirely based on the fact that  unlike Florida, which recognizes a so-called temporary or intermittent insanity operative only at the time of the offense, Ferguson v. State, 417 So.2d 631 (Fla. 1982); Cochran v. State, supra  the law of New Mexico permits an insanity defense only when the defendant is afflicted with a mental disease "extending over a considerable period of time." [e.o.] 535 P.2d at 644. In decisive contrast to the present case, the verdict in Nagel therefore necessarily concluded  and the jury "could" not have otherwise determined  that the defendant had also been insane *602 during the earlier crimes. Nacher also strongly relies on United States ex rel. Taylor v. Redman, 500 F. Supp. 453 (D.Del. 1980), appeal dismissed per stipulation (3rd Cir. June 7, 1982). There, the court[10] upheld the contention that an insanity verdict should have barred the defendant's trial on offenses which occurred in the same general course of conduct but some hours earlier and in another county. It concluded, based on a meticulous examination of the particular record[11]
that a rational jury could not have reached a verdict of not guilty by reason of mental illness without determining that the petitioner was mentally ill during the entire series of actions comprising the crimes charged in the two proceedings.
500 F. Supp. at 457. Because, as we have seen, the record of the earlier trial in Nacher's case demonstrates otherwise, a different result must follow.
Affirmed.
NOTES
[1] It bears emphasis that, since the reason for the rule is to prevent the state from relitigating the same issue it has once lost, the sole pertinent inquiries on a collateral estoppel claim are (a) the basis of the conclusion reached in the prior proceeding  here, the trial of the May 30th offense  and (b) whether it constitutionally forecloses relitigation of the determinative issue in a later one  here, the trial of the May 29th crimes which resulted in the convictions before us. Concomitantly, if, as is conceded, it is sufficient independently to support the verdict, and, apart from identifying the question to which collateral estoppel may apply, the nature of the evidence in the second trial, including the degree of its similarity to that in the first, is totally irrelevant. Specifically, it does not legally matter, although the parties have mightily joined issue on the point, whether there are differences in the two generally parallel records which might explain what seem to be inconsistent results. With some exceptions not pertinent here, e.g., Redondo v. State, 403 So.2d 954 (Fla. 1981), a criminal defendant can take no advantage of any such inconsistency which does no violence to a constitutionally protected right. See Gonzalez v. State, 449 So.2d 882 (Fla. 3d DCA 1984), pet. for review denied, 458 So.2d 274 (Fla. 1984). In sum, Nacher may only take comfort in his acquittal of the May 30th charge even though it may be "inconsistent" with his May 29th conviction, rather than complain about the conviction because it is arguably contrary to the acquittal. (Having said all this, we shall make some reference, purely as a matter of general interest, to the second trial in some of the notes that follow.)
[2] We point out that, in accordance with the universal rule on the subject, see 32 Fla.Jur.2d Judgments and Decrees § 117 (1981), the collateral estoppel test is whether a jury "could" have based its decision on another ground, not whether it in fact did or is likely to have done so. See Ashe v. Swenson, supra; McCray v. State, 397 So.2d 1229 (Fla. 3d DCA 1981), aff'd, 425 So.2d 1 (Fla. 1983). (It would, of course, be impossible to resolve any such question.)
[3] The same two defense doctors testified in the second trial to generally the same opinions; likewise, the same two prosecution psychiatrists testified in each trial to their opinions that Nacher was sane during the night respectively in question. See, however, note 1 supra.
[4] For example, Dr. Stillman stated:

... he was severely toxic and had effect on his brain because of misuse and abuse of large doses of drugs and alcohol, which was a form of self-treatment for him.
* * * * * *
I think he sought out help, help in the form of street drugs and alcohol.
* * * * * *
If you were taking cocaine and marijuana and barbiturates, it is not specifically for mental illness. It reduces anxiety temporarily but after a while you start to become addicted to these things and the end result is that you are worse off than when you started, because now you have an additional problem. On top of that he got to be able to find this on the street. He got to be able to locate it. If someone gives it to him, fine. If not, then his thinking starts to be disturbed. These are toxic substances which affect the cortex of the brain. It reduces inhibition. It confuses the thinking as it becomes more poisonous and the need for it increases so you become more poisoned.
Now, maybe his original symptoms are controlled, but he developed a lot of other symptoms far worse.
* * * * * *
For instance, his impulsivity increases. His personality changes. His tolerance is reduced. Anyone can get him to do almost anything. His thinking becomes totally confused so he can't even be logical. He will do things and from a distance you are looking at him and you think he is doing something that looks logical and goal oriented and he doesn't know what he is doing. He is in a state of drunkenness and yet may not be staggering.
[5] Did he tell you about anything he did that night, outside of what he stated that he shot at a police officer?
A. He told me he had taken some drugs.
Q. Did he tell you what he took?
A. He told me that he had, through the course of his arrival on that date, in the United States, had taken, had used marijuana, had used cocaine, had used hypnotics, quaaludes, for example, and had consumed alcohol.
Q. You said he told you he had taken drugs that night?
A. Yes.
Q. Did he tell you what drugs he took?
A. He only told me he had been taking drugs and he told me that he had been taking and used cocaine, and he had taken quaaludes and had consumed various alcoholic beverages.
[6] Although it is irrelevant because the second jury was entitled to reject what the first one accepted, see note 1 supra, there was similar testimony at the second trial concerning the defendant's drug ingestion prior to the night of May 29th.
[7] Again, see notes 1, 6 supra, it does not matter whether the defendant's conduct during the May 29th holdup was or was not roughly equivalent.
[8] In contrast, the first acquittal was read into evidence by agreement in the second trial.
[9] See note 2 supra.
[10] We are bound to note that the decision is one of a single district judge who, in a federal habeas corpus action, overturned a unanimous decision of the Supreme Court of Delaware in the same case, Taylor v. State, 402 A.2d 373 (Del. 1979).
[11] trial, all of the evidence offered to prove the mental illness of the petitioner aimed at establishing that it preceded and caused the actions. Neither the defense nor the prosecution attempted to break down the duration of the mental illness within the period from the original abduction to the release of the victim. In eliciting testimony from state and defense psychiatrists concerning the mental state of the petitioner, both the prosecution and the defense repeatedly directed the attention to their witnesses to August 20, 1975 without specifying the time more precisely... . There was no testimony to the effect that petitioner became mentally ill after leaving New Castle County. Rather, the evidence presented by the defense indicated that the petitioner had a long standing obsession or neurosis, which underlay his actions on August 20, 1975... . The psychiatrists for the defense testified to the effect that on that date the petitioner lacked the will power to restrain his actions, ... while the state psychiatrist testified to the contrary... . The jury could have rejected the defendant's psychiatric evidence and accepted the prosecution's expert testimony. It did not do so. In accepting the defense evidence the jury necessarily determined that the petitioner was mentally ill prior to and in the course of the entire sequence of actions on August 20.
500 F. Supp. at 457.