643 A.2d 389

**Michael BUTLER**

v.

**STATE of Maryland.**

**No. 75, Sept. Term, 1992.**

Court of Appeals of Maryland.

June 27, 1994.

240

---

Mark Colvin, Asst. Public Defender (Stephen E. Harris, Public Defender, both on brief), Baltimore, for petitioner.

Cathleen C. Brockmeyer, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE,* CHASANOW, KARWACKI and BELL, JJ.

---

* McAuliffe, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, § 3A, he also participated in the decision and adoption of this opinion.

CHASANOW, Judge.

We granted Michael Butler's petition for a writ of certiorari to decide whether the doctrine of collateral estoppel bars the State from retrying Butler for various counts on which the jury deadlocked at his former trial. Butler contends that, by finding him guilty of being an accessory after the fact in that trial, the jury determined that he was not a principal in the offenses on which the jury was unable to reach a verdict. For the reasons discussed below, we hold that collateral estoppel does not preclude the retrial.

## I.

On August 12, 1989, the Howard County police responded to a call about a shooting in Columbia, Maryland. Upon arriving at the scene, the police found an automobile (a Buick "Riviera") with its engine running and its turn signal activated. The driver, Sherman Chenault, was slumped behind the wheel of the vehicle with a gunshot wound to his neck and one to the back of his head. Another victim of the shooting, Sharrell Hudson, approached the police officers and informed them that she had been shot in the face.

Emergency medical personnel arrived at the scene, examined the driver, and confirmed that he was dead. Hudson, on the other hand, survived the shooting. She was admitted to the Shock Trauma Unit of the University of Maryland Medical System, where it was determined she had a bullet wound to the left side of her face and a fractured jaw.

By way of an eight-count indictment, Michael Butler was charged with having been one of two assailants who attacked Hudson and Chenault. The specific charges contained in that indictment were as follows:

1. Murder of Chenault;
2. Assault with intent to murder Hudson;
3. Use of a handgun in the murder of Chenault;
4. Use of a handgun in the commission of a felonious assault on Hudson;

5. Common law assault on Hudson;

6. Common law battery on Hudson;

7. Transportation of a handgun; and

8. Accessory after the fact to the murder of Chenault.

The indictment also named Kent Tilghman[1] as the other assailant.

Butler was tried by a jury in the Circuit Court for Howard County (Kane, J.). The evidence at trial disclosed that the attack on Chenault and Hudson occurred during what the victims were led to believe was the consummation of a drug deal. The State called Ms. Hudson and various other witnesses in support of its case. Hudson described the events leading up to, and including, the shooting in Columbia.

Hudson testified that in the late afternoon of August 11, 1989, Chenault came over to her house. Chenault then telephoned Tilghman and arranged to meet with him later that evening. After the phone call, Hudson saw Chenault take "a whole lot of money" out of a metal box and count it.[2] At approximately 10:00 p.m., Chenault left the house to meet Tilghman at a McDonald's on Security Boulevard. Approximately thirty minutes later, however, Chenault returned to Hudson's house, placed a gun and the metal box containing the money into a black vinyl bag, and asked Hudson to accompany him to meet Tilghman "because he was lost."

Chenault, Hudson, and her five-year old daughter then drove in the Riviera to the McDonald's to meet Tilghman. Tilghman, accompanied by Butler's sister, arrived at the McDonald's in a Toyota Celica. The group proceeded to Butler's mother's house, where Chenault took the money out of the

---

1. There are conflicting spellings of Tilghman's last name in the record. For purposes of clarification, we shall use the spelling "Tilghman," which was used by the Court of Special Appeals in its opinion. *See Butler v. State,* 91 Md.App. 515, 605 A.2d 186 (1992).

2. Hudson estimated that Chenault counted out about $17,000. According to Anthony McGrath, a correctional officer where Butler was incarcerated while awaiting trial, Butler admitted to obtaining $25,000 from the attack.

metal box and handed it to Tilghman, who in turn placed it into a yellow trash bag. Although in Butler's first statement to the police he said he only heard about but did not see any money, this claim was contradicted by Hudson. After Tilghman and Chenault finished putting the money in the yellow bag, the two of them went outside of the house. Tilghman had the yellow bag and his keys in his hand.

About twenty-five minutes later, Chenault and Tilghman came back inside the house without the yellow trash bag. Shortly thereafter, while Chenault was in the bathroom, Tilghman and Butler went upstairs for several minutes. When they came back downstairs, Tilghman called his brother's beeper number and waited for his call to be returned. The phone rang shortly thereafter, Tilghman said a few words to the caller, and then informed everyone that it was time to leave. Hudson testified that just before they left Tilghman asked Butler to go upstairs and get the keys to the Celica. Butler, however, immediately pulled them out of his pocket.[3]

At approximately midnight, they departed. Chenault drove the Riviera. He was accompanied by Hudson, who sat in the front passenger seat, and Hudson's daughter and Tilghman, who sat in the rear seat. Following Chenault, Butler drove alone in the Celica even though he had no driver's license. The Toyota Celica that Butler drove to Columbia belonged to Tilghman's girlfriend. During the drive, Butler was sometimes in front of the Riviera and sometimes behind it. Eventually both cars reached the village of Owen Brown, which is located in Columbia. Tilghman directed Chenault to the parking lot of an apartment complex. After Chenault pulled into a parking space, he asked Tilghman if Tilghman's brother was there yet. Tilghman's response was "no, not yet," immediately followed by multiple gunshots.

Hudson testified that Tilghman "started shooting us inside of the car." Hudson, however, was not looking at Chenault or

---

**3.** Butler contradicted Hudson and claimed that he received the keys to the Celica from Tilghman only after they had exited the house.

Tilghman when the bullets began to fly. Rather, she was looking out the passenger side window and attempting to locate Butler. She did not see a gun. Hudson described feeling "a sharp pain on the left side of my head," hearing "loud noises like the car was maybe blowing up or something," and feeling Chenault fall over on top of her. Her daughter Monique started crying in the back seat. Hudson heard car doors shutting and a car driving away, and then noticed that the Celica was no longer in the parking lot. She exited the Riviera with her daughter, and asked the occupant of a nearby apartment to call the police and an ambulance.

During a subsequent search of the Riviera, the police discovered a black bag containing, *inter alia*, a nine millimeter handgun along with two clips. Tilghman's fingerprints were lifted from the driver's door. Butler's fingerprints were not found on or in the Riviera, nor on any of its contents. The police did not find any money (except for 53 cents), nor the yellow trash bag.

In addition to Ms. Hudson, the State called Officer Michael McKnight. He testified that on September 12, 1989, nearly a month after the crime, he and another officer spotted Butler walking down the street. Because Butler matched the description of a suspect in a homicide, they attempted to stop him. Butler ran, a chase ensued, and eventually the officers found him hiding in a dumpster. Butler initially gave the officers a false name and told them he ran because he thought a warrant might be outstanding for his failure to appear in court that morning. A short time later at the police station, another officer warned Butler not to run because Officer McKnight was "a killer." According to McKnight, Butler looked him in the eye and said, "so am I." Officer McKnight further testified that Butler said, "they're not going to pin anything on me. They think I'm an accomplice."

Another witness, Anthony McGrath, testified to admissions made by Butler which strongly supported the State's theory that Butler was an aider and abettor. McGrath, a correctional officer at the Howard County Detention Center where Butler

was incarcerated while awaiting trial, testified that Butler "asked me do I know what he was in there for. I said 'yes,' and he said 'I'm in here for murder.' He says, 'You know, McGrath, I did it.' " When asked if Butler said anything else, McGrath replied:

> "[Butler] raise[d] his hand like he had a gun in his grasp, and said, 'Boom, boom.' He said, 'I watched the bullets enter the back of the head, come out of the front of the head, and hit the dashboard.' He said, 'And then I watched him bleed to death.' He said, 'I collected $25,000.00 and left.' He also told me that his lawyer was going to get him off."

These statements contradicted Butler's trial testimony that he did not expect to receive nor did he obtain any money as a result of the shootings. Furthermore, these admissions were inconsistent with Butler's statement that he was a distance away from the Riviera and seated in another car when the shots were fired.

The State also called Police Detective Patricia Full, the officer who interrogated Butler after his arrest. The State supplemented Detective Full's testimony by playing a tape recording of the interrogation for the jury. During police interrogation, Butler maintained that he did not know where Chenault and Tilghman were going that evening, but that he thought they were engaged in a drug transaction; however, Butler did inform Detective Full that he had previously been to the Owen Brown community. Upon arriving at Owen Brown, Butler stated that he saw Tilghman getting out of the Riviera firing a gun. As for the number of gunshots he heard, Butler declared, "I know it was more than one shot. . . . [A]fter that one, if it was 4, 5, 6, 8, I can't say how many." Detective Full testified that Butler claimed he started to drive away when he heard the gunshots. He was stopped, however, by Tilghman who told him that he had shot Chenault and Hudson. Tilghman then got into the car and Butler drove them away from the scene of the crime. According to Full, Butler also stated that he pulled to the side of the highway and allowed Tilghman to take over the driving. Butler main-

tained that he feared for his life, and therefore, he slid across to the passenger seat because he believed that if he got out of the car Tilghman would shoot him.

The crux of Butler's trial testimony was that he had no prior knowledge of Tilghman's intention to kill Chenault and Hudson. He claimed that he had only agreed to drive the car to Columbia in exchange for a ride home. In accordance with his earlier statement to Detective Full, Butler asserted that when he heard the shots he threw the car in drive and attempted to leave. Butler surmised that Tilghman must have heard the "revving" of the engine when Butler hit the gas because Tilghman ran over in front of the car causing Butler to stop. Tilghman jumped in the car and ordered Butler to drive from the scene of the crime. Butler testified that he asked Tilghman, "Man, what . . . you shoot them people for?" He testified that he remained in the car even after Tilghman took over the driving because he feared for his life. After the shootings, according to Butler, Tilghman picked up Butler's wife and drove the couple to Butler's uncle's house where they were temporarily residing.

Two of the State's witnesses who were residents of the Owen Brown community somewhat contradicted Butler's testimony that, after he pressed on the gas pedal in an attempt to leave Tilghman at the scene, Tilghman jumped in front of the car and forced him to stop. On the night of the incident, one of the witnesses heard what he believed were firecrackers immediately followed by "a car moving away at a real rapid pace." Explaining that he did not hear any break in the acceleration, the witness stated, "[i]t's not like it started up and it stopped, it just went." Another State's witness, although not asked directly whether there was a break in the acceleration, testified that he heard "three quick [gun]shots in a row and then two spaced a little further apart after it. Bang, Bang, Bang, bang, bang, along those lines." Less than fifteen to twenty seconds after the shots, he heard a car engine "revving very high and it was obviously moving as quickly as it could."

Based on the aforementioned testimony, the jury returned verdicts of not guilty of second degree murder of Chenault and guilty of accessory after the fact to the murder of Chenault.[4] The jury, however, was deadlocked on the charges of first degree murder of Chenault and the use of a handgun in the murder of Chenault. The jury was also hung on all four of the charges that related to the attack on Hudson. Butler was sentenced to five years in prison for the accessory-after-the-fact conviction.

When the State indicated its intention to retry Butler on the six unresolved charges, Butler filed a motion to dismiss which maintained that double jeopardy and collateral estoppel principles precluded such a retrial. Arguments were heard on the motion at a January, 1991 hearing. Based on those arguments, the circuit court judge (Sybert, J.) ruled that all of the unresolved charges relating to Chenault were barred by double jeopardy. With respect to the charges concerning the assault on Hudson, however, the court ruled that the State could proceed to retrial. Although Butler appealed the ruling on the unresolved counts concerning Hudson, the State chose not to appeal the dismissal of the charges pertaining to Chenault. Writing for the Court of Special Appeals, Judge Moylan thoroughly analyzed both the doctrine of collateral estoppel and the facts in the instant case and affirmed the trial court. *See Butler v. State,* 91 Md.App. 515, 605 A.2d 186 (1992). Following this unfavorable judgment by the intermediate appellate court, Butler petitioned this Court for a writ of certiorari which we granted.

## II.

In *Benton v. Maryland,* 395 U.S. 784, 787, 89 S.Ct. 2056, 2058, 23 L.Ed.2d 707, 711 (1969), the United States Supreme Court held that the double jeopardy prohibition of the Fifth Amendment is applicable to the states as part of the Due Process Clause of the Fourteenth Amendment. One year

---

4. The judge previously granted Butler's motion for judgment of acquittal on the count charging transportation of a handgun.

later in *Ashe v. Swenson,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), the Court further concluded that the doctrine of collateral estoppel is embodied within the Fifth Amendment guarantee against double jeopardy. *See also Turner v. Arkansas,* 407 U.S. 366, 368, 92 S.Ct. 2096, 2098, 32 L.Ed.2d 798, 801 (1972) ("Collateral estoppel is part of the Fifth Amendment's double jeopardy guarantee...."). Collateral estoppel is also an established component of Maryland's common law. *See Ford v. State,* 330 Md. 682, 719, 625 A.2d 984, 1002 (1993); *Gibson v. State,* 328 Md. 687, 693, 616 A.2d 877, 880 (1992); *Ferrell v. State,* 318 Md. 235, 241, 567 A.2d 937, 940, *cert. denied,* 497 U.S. 1038, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990).

■ Simply stated, the doctrine of collateral estoppel is as follows: "[W]hen a[n] issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe,* 397 U.S. at 443, 90 S.Ct. at 1194, 25 L.Ed.2d at 475. Applying *Ashe* in *Wooten–Bey v. State,* 308 Md. 534, 520 A.2d 1090, *cert. denied,* 481 U.S. 1057, 107 S.Ct. 2199, 95 L.Ed.2d 853 (1987), this Court explained that, if the verdict " 'must have, by logical necessity, decided a particular fact in favor of a defendant, then the State will be barred by collateral estoppel principles from relitigating that fact....' " 308 Md. at 544, 520 A.2d at 1095 (quoting Richard P. Gilbert & Charles E. Moylan, Jr., *Maryland Criminal Law: Practice and Procedure* § 37.8, at 450 (1983)).

■ Although collateral estoppel is usually invoked based upon a prior acquittal, *see, e.g., Ashe, supra; Ferrell, supra; Powers v. State,* 285 Md. 269, 401 A.2d 1031, *cert. denied,* 444 U.S. 937, 100 S.Ct. 288, 62 L.Ed.2d 197 (1979), the critical consideration is whether an issue of ultimate fact has been previously determined in favor of the defendant. *See Grant v. State,* 318 Md. 672, 569 A.2d 1237 (1990) (addressing a collateral estoppel claim based upon a prior conviction). As we stated in *Ford v. State,* collateral estoppel "analysis focuses on what the fact finder did find or must have found." 330 Md. at

720, 625 A.2d at 1002. *See also Burkett v. State,* 98 Md.App. 459, 465, 633 A.2d 902, 905 (1993) ("Collateral estoppel is concerned . . . not with the legal consequences of a judgment but only with the *findings of ultimate fact,* when they can be discovered, that necessarily lay behind that judgment." (emphasis in original)); *Butler,* 91 Md.App. at 517, 605 A.2d at 187 ("Collateral estoppel . . . is stubbornly factbound.").

When addressing collateral estoppel challenges, we must always remember that the burden is on the party asserting estoppel to show that "the issue whose relitigation he seeks to foreclose was *actually decided* in the first proceeding." *Dowling v. United States,* 493 U.S. 342, 350, 110 S.Ct. 668, 673, 107 L.Ed.2d 708, 719 (1990) (emphasis added). *See also Butler,* 91 Md.App. at 544, 605 A.2d at 200 (recognizing that the "moving party has the burden of proof"); *Holloway v. State,* 14 Md.App. 703, 711, 288 A.2d 652, 656 (1972) (Orth, J.) (noting that "it was incumbent upon [the defendant] to produce proper evidence sufficient for the court to rule" on whether collateral estoppel required dismissal of charges). Courts have maintained that this is a difficult burden to overcome. *See, e.g., People v. Acevedo,* 69 N.Y.2d 478, 487, 515 N.Y.S.2d 753, 759, 508 N.E.2d 665, 671 (1987) ("Defendant's burden to show that the jury's verdict in the prior trial *necessarily* decided a particular factual issue raised in the second prosecution is a heavy one indeed, and as a practical matter severely circumscribes the availability of collateral estoppel in criminal prosecutions." (emphasis in original)); *United States v. Clark,* 613 F.2d 391, 400 (2d Cir.1979) (declaring that the defendant carries a heavy burden of proof), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980); *United States v. Seijo,* 537 F.2d 694, 697 (2d Cir.1976) (asserting that the defendant's burden of establishing that the issue he seeks to foreclose was necessarily resolved in his favor by the first verdict is a "heavy one"), *cert. denied,* 429 U.S. 1043, 97 S.Ct. 745, 50 L.Ed.2d 756 (1977). *See also Holloway,* 14 Md.App. at 706, 288 A.2d at 653 ("It seems that collateral estoppel will not often be available to a criminal defendant [because] it is not often possible to determine with precision

how the judge or jury has decided a particular issue." (footnote omitted)).

With this background in mind, we now turn to Butler's contention that collateral estoppel precludes the State from retrying him on the counts pertaining to the attack on Hudson. Butler maintains that his conviction for being an accessory after the fact to the shooting of Chenault means the jury found as an ultimate fact that he was not guilty of aiding and abetting the shooting of Sharrell Hudson. He bases this conclusion on the assertion that "the instructions made it clear to the jury that an accessory after the fact to murder cannot also be guilty of the murder." We disagree.

First, we point out that Butler's conviction of accessory after the fact to the murder of *Chenault* is not, as a matter of law, inconsistent with convictions for aiding and abetting in the shooting of *Hudson*. Although Butler's case predates the abrogation of the common law rule that one could not *legally* be both an accessory after the fact and a principal to the same substantive felony, *see State v. Hawkins*, 326 Md. 270, 604 A.2d 489 (1992), Butler was not charged with being an accessory after the fact in any of the counts related to Hudson. Indeed, there could be no accessory after the fact to a majority of those counts because they were misdemeanors. Thus, Butler cannot avoid retrial based on the old common law rule that accessories after the fact cannot also be principals in the same crime because the murder of Chenault and the assault with intent to murder Hudson are different felonies.

As for the unresolved counts concerning the attack on Chenault, the State conceded that under double jeopardy principles Butler could not be retried for the first degree murder of Chenault because at the time of his conviction, prior to *State v. Hawkins*, 326 Md. 270, 604 A.2d 489 (1992), there was a legal (not factual) bar to being both a principal in the second degree and an accessory after the fact to the *same* substantive felony. Thus, double jeopardy, which is concerned with the legal implications of a verdict, barred retrial of the

murder charge upon which the accessory-after-the-fact charge was predicated.

Recognizing that collateral estoppel deals with factual conclusions, Butler argues that an accessory-after-the-fact conviction is *factually* inconsistent with a finding that he aided and abetted the shooting of Hudson. We disagree. Where, as in the instant case, the jury is not clearly instructed to the contrary, a person could be factually guilty of being a principal in the second degree by aiding and abetting as well as guilty of being an accessory after the fact. We made this observation in *Hawkins* when discussing jury instructions similar to those given in the instant case. In *Hawkins*, Judge Orth first noted that, as in the instant case, there was no instruction that one cannot be both a principal and an accessory after the fact. Writing for the Court, Judge Orth then stated:

> "If the jury applied this instruction as given, it could render a verdict of guilty on each of the murder charge and the accessory charge which would be *factually correct*. Such verdicts would be in accord with the instructions given and not contrary to the evidence." (Emphasis added).

*Hawkins*, 326 Md. at 287–88, 604 A.2d at 498. That statement is equally applicable in the instant case. As Judge Moylan observed,

> "[t]he jury, as a group of laymen, would have no independent knowledge that the Maryland common law at the time treated principalship and accessoryship after the fact as mutually exclusive. Common sense would dictate no such notion. *To the laymen, a criminal might easily be guilty both of 1) participating in a crime and then 2) driving the getaway car.* Each could well qualify as a separate crime." (Emphasis added).

*Butler*, 91 Md.App. at 551, 605 A.2d at 204. *See also Eiland v. State*, 92 Md.App. 56, 100, 607 A.2d 42, 64 (1992) ("[T]here would be nothing *logically* inconsistent in convicting [Eiland] of both offenses. In aiding and abetting Tyler in the course of the murder, he was a principal in the second degree as to the murder. In subsequently driving Tyler away from the scene,

he, quite independently, was an accessory after the fact to [the murder committed by Tyler]." (emphasis in original)), *rev'd on other grounds, Tyler v. State,* 330 Md. 261, 623 A.2d 648 (1993). Based on the evidence, a jury reasonably could have found that Butler drove Tilghman away from the crime scene as well as plotted with Tilghman to commit the crime. Thus, the conviction for being an accessory after the fact to the murder of Chenault is neither legally, nor necessarily factually, inconsistent with a finding that Butler aided and abetted in the attack against Hudson.

Butler cites *Grant v. State,* 318 Md. 672, 569 A.2d 1237 (1990), in support of his collateral estoppel challenge based upon a prior conviction rather than an acquittal. In *Grant,* the defendant was found in Baltimore City in possession of goods stolen during a Baltimore County storehouse breaking. He entered a plea of guilty in Baltimore City to theft. Although there were no factual findings made during the plea, "'it was apparently understood that the basis of the State's case was that the [Petitioner] was the receiver of the stolen property.'" 318 Md. at 677, 569 A.2d at 1239 (quoting *Grant v. State,* 76 Md.App. 165, 169, 543 A.2d 897, 899 (1988)). Following the plea of guilty, Grant was charged with and convicted of storehouse breaking with intent to steal the same goods found in his possession in Baltimore City. This Court reversed his Baltimore County storehouse breaking conviction.

We first pointed out that being a receiver precluded any later finding that the defendant was the person who stole the same goods; however, that would not foreclose a subsequent prosecution for breaking with intent to steal since receiving stolen goods and breaking with intent to steal are not legally inconsistent. Thus, the prosecution for the separate crime was not barred. What collateral estoppel did bar was drawing two separate inconsistent factual inferences from Grant's possession of stolen goods. In Baltimore City, the State used Grant's possession to draw the inference he was a receiver of the goods but not the thief, and in Baltimore County, the State used Grant's possession to draw an inconsistent inference that he was the thief and not the receiver.

Judge Blackwell summed up the Court's limited holding as follows:

"There were no witnesses who placed Grant at the scene of the breaking, or who involved him in the breaking in any way. The State proved that a breaking occurred, and that property had been stolen as a result of the breaking. From this the jury could have found the corpus delicti—that the crime of breaking a storehouse with the intent to steal had been committed by someone. There remained to be proven the criminal agency of the defendant. This the State sought to prove solely by evidence that Grant had been found in exclusive possession of the recently stolen property.

\* \* \*

In the absence of the previous adjudication in Baltimore City, the State's evidence in the Baltimore County case would have been sufficient to allow the jury to find Grant guilty of the breaking, through the use of the inferences. Because the State had previously participated in the adjudication that Grant was the receiver of the stolen goods, however, and because a receiver cannot also be the thief, the State was precluded from relying on the otherwise permissible inference that Grant was the thief. Without the finding, by inference or otherwise, that Grant was the thief, the subsequent inference that Grant participated in the breaking was also unavailable.

In short, although the State might have convicted Grant of storehouse breaking if it had produced independent evidence of his involvement in the breaking, the State was in this instance precluded from relying on inferences flowing from his unexplained possession of recently stolen property to establish that fact. Because a review of the record shows that the State's proof of breaking depended entirely upon the precluded inference, the conviction must be reversed."

*Grant,* 318 Md. at 680–81, 569 A.2d at 1241. Thus, *Grant* does not preclude prosecution for storehouse breaking after conviction of the rather inconsistent crime of being a receiver of property stolen in the storehouse breaking. *Grant* only pre-

cludes the State from drawing two totally inconsistent factual inferences from the same item of evidence, *i.e.*, being found in possession of stolen goods. *Grant*'s holding precluded the State from convicting Butler as an accessory after the fact to Sherman Chenault's murder and the then legally inconsistent crime of being an aider and abettor to that same murder. On the other hand, just as Grant could be tried for the "legally consistent" crime of storehouse breaking, Butler can be retried for the "legally consistent" crime of aiding and abetting in the shooting of Hudson.

Retrial should be barred only if the jury, by convicting Butler of being an accessory after the fact to the attack on Chenault, made a factual determination that Butler did not aid and abet Tilghman during the commission of the offenses against Hudson. We must therefore determine whether this particular jury *understood* that an accessory after the fact was not also an aider and abettor to the other offenses.

In order to decide whether a factual determination was made which would bar retrial of the unresolved counts, we shall employ the Supreme Court's method of analyzing collateral estoppel claims. In *Ashe*, the Supreme Court stated the following: "[D]ecisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." 397 U.S. at 444, 90 S.Ct. at 1194, 25 L.Ed.2d at 475. The Supreme Court further explained that, in determining whether collateral estoppel is applicable, a reviewing court is to " 'examine the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude *whether* a rational jury *could have* grounded its verdict upon an issue *other than* that which the defendant seeks to foreclose from consideration.' " *Ashe*, 397 U.S. at 444, 90 S.Ct. at 1194, 25 L.Ed.2d at 475–76 (quoting Daniel K. Mayers & Fletcher L. Yarbrough, Bis Vexari: *New Trials and Successive Prosecutions*, 74 Harv.L.Rev. 1, 38–39 (1960) (emphasis added)). *See Dowling*, 493 U.S. at 350–51, 110 S.Ct. at 673–74, 107 L.Ed.2d at 719–20 (applying *Ashe*'s ra-

tional approach to collateral estoppel challenges); *Sealfon v. United States,* 332 U.S. 575, 579, 68 S.Ct. 237, 240, 92 L.Ed. 180, 184 (1948) (noting that the inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings"). *See also Turner,* 407 U.S. at 368, 92 S.Ct. at 2098, 32 L.Ed.2d at 801; *Simpson v. Florida,* 403 U.S. 384, 385, 91 S.Ct. 1801, 1802, 29 L.Ed.2d 549, 552 (1971). This Court has also declared that a court " 'should not strain to dream up hypertechnical and unrealistic grounds on which the previous verdict might conceivably have rested.' " *Ferrell,* 318 Md. at 245, 567 A.2d at 942 (quoting *United States v. Jacobson,* 547 F.2d 21, 23 (2d Cir.1976), *cert. denied,* 430 U.S. 946, 97 S.Ct. 1581, 51 L.Ed.2d 793 (1977)).

*Ashe* and its progeny make clear that our task is to view the entire record reasonably and rationally rather than hypertechnically. We should bar retrial only if the jury necessarily made an express factual finding that Butler did not aid and abet Tilghman in Hudson's shooting. Thus, if a necessary element of any one of the unresolved offenses has already been adjudicated against the State, retrial on that offense is improper.

 In his attempt to demonstrate that, by convicting him of being an accessory after the fact, the jury found he was not an aider or abettor in the attack on Hudson, Butler relies heavily on the following portion of the trial judge's instructions to the jury:

> "Now, the defendant is also charged with being an accessory after the fact to the murder of Sherman Joseph Chenault. In this case, an accessory after the fact is a person with knowledge that a crime has been committed [who] assists the offender by transporting him from the scene of the crime. In order to be guilty of this crime: One, *the defendant must have become associated with the felony after its commission;* Two, the defendant must have provided assistance with knowledge that the felony had been completed; Three, the assistance must have been given to one known to be the felon; And, four the assistance

must have been given in order to hinder the felon's apprehension by transporting him from the scene.

The term 'knowledge' means that at that time the relief or assistance was given the defendant must have had actual knowledge *that the person assisted was the one who committed the felony.* An act is done knowingly if it's done purposefully and not because of some mistake, or accident, or inadvertence, or for some innocent reason. Knowledge can be inferred from all the surrounding facts and circumstances in the case.

The term 'assistance' means that there must be a positive, affirmative act to help or aid someone to escape arrest or capture. The mere failure to disclose the commission of the felony or to apprehend the felon or the mere approval of the felony is not sufficient to constitute accessory after the fact.

In order for the defendant to be convicted as an accessory after the fact, the State must prove beyond a reasonable doubt each of the elements of the underlying crime *including that the crime was committed by someone other than the defendant.*" (Emphasis supplied by Butler in his brief).

Although this portion of the instructions arguably intimates that an accessory after the fact is not a principal, it does not clearly convey that the crimes are mutually exclusive. Moreover, jury instructions should be considered as a whole without undue emphasis on minor ambiguities or minor inconsistencies.

There was an additional jury instruction which directly contradicts Butler's contention. The trial court instructed the jury that each count should be considered separately and that they were not mutually exclusive. The judge stated as follows:

"I instruct you to consider each count separately and to weigh the evidence relevant to each count as if it were the only count with which the defendant is charged. Each defendant is entitled to have his guilt or innocence determined as to each count from the evidence which applies to that count. And you're instructed to avoid any position of

prejudice as to any count based upon some conclusion which you may have reached concerning some other count. *The guilt or innocence of a defendant as to each individual count should not control or influence your finding of guilt or innocence on some other count.* You may find the defendant guilty or not guilty as to one or more of the counts but your verdict must be reached on the basis of the evidence as it applies separately to each individual count.

Now those counts are simply stated on this verdict sheet, and this verdict sheet I'll give to your forelady and she can take it with her into the jury room. It may assist you in the course of your deliberations. It obviously is going to assist us in understanding your verdict when you return it.

The counts are murder in the first degree of Sherman Joseph Chenault; murder in the second degree of Sherman Joseph Chenault; assault with intent to murder Sharrell Hudson; use of a handgun in the murder of Sherman Joseph Chenault; use of a handgun in the assault of Sharrell Hudson; assault upon Sharrell Hudson; battery upon Sharrell Hudson; *and accessory after the fact to the murder of Sherman Joseph Chenault.* And you'll be asked to list your verdict—not guilty or guilty—on each one of these that will accompany, go with you to the jury room." (Emphasis added).

Considering this instruction along with the instructions on the substantive crimes, it is highly unlikely that the jury believed a verdict on the accessoryship count would preclude a guilty verdict on any other count. Immediately after informing the jurors that "[t]he guilt or innocence [on] each individual count should not control or influence your finding of guilt or innocence on some other count," the judge listed accessory after the fact as one of the counts to which this instruction would apply. This instruction clearly informed the jurors they *could* find Butler guilty of aiding and abetting in the assaults *and also* guilty of being an accessory after the fact to the murder. It unquestionably established that a conviction on the accessoryship count would not necessarily preclude a guilty verdict on

the other counts or bar Butler's conviction on the other counts.[5]

From the total package of instructions, we believe the jury could have decided that Butler was an aider and abettor in the assaults, *and also* became associated with the felony after its commission by driving Tilghman from the scene. The instructions taken as a whole simply did not foreclose dual culpability by being an aider and abettor during the offenses as well as becoming an accessory after the fact by driving the principal offender from the scene.

Butler also points to the closing arguments of counsel, and maintains that "it is clear from their comments that counsel agreed that [Butler] was *either* a principal *or* an accessory after the fact." (Emphasis in original). Like the jury instructions, however, these arguments did not clearly advise the jury that the crime of accessory after the fact was

---

**5.** Judge Eldridge's dissenting opinion downplays the effect of these instructions on the jury by explaining that trial judges routinely instruct juries to "consider each count separately" when defendants are charged with multiple counts. *Butler v. State*, 335 Md. 238, 255, 643 A.2d 389, 397 (1994) (Eldridge, J., dissenting). The instructions in the instant case went beyond merely informing the jurors to consider the counts separately, but explicitly told them that "[t]he guilt or innocence [on] each individual count should not control or influence your finding of guilt or innocence on some other count." The instructions should have better explained the relationship between verdicts on the accessory-after-the-fact count and the other counts. *See State v. Hawkins*, 326 Md. 270, 289, 604 A.2d 489, 499 (1992) (concluding that the trial judge should have clarified that accessory after the fact and the predicate felony are mutually exclusive). Even Maryland Criminal Pattern Jury Instruction 6:02, which defines an accessory after the fact in language similar to that used by the trial judge in the instant case, recognizes the need to clarify that accessory after the fact and principalship are legally inconsistent under pre-*Hawkins* law. *See State v. Hawkins*, 326 Md. 270, 604 A.2d 489 (1992). In the "Notes on Use" for that instruction, the authors stress that "[t]he court should also instruct the jury that being a principal and being an accessory after the fact are inconsistent charges and that the jury may not find guilt on both." *Maryland Criminal Pattern Jury Instructions (MPJI–Cr)* 6:02, at 496 (1991). Because the instructions given in the instant case failed to explain this inconsistency adequately, the jury could have believed that a guilty verdict on the accessory-after-the-fact count was not inconsistent with a guilty verdict on any other count.

mutually exclusive to the other crimes charged. Defense counsel, in his closing argument, maintained that Butler was not an aider and abettor. His argument concerning the accessory-after-the-fact charge failed to indicate that one could not be both an aider and abettor as well as an accessory after the fact. Butler's counsel stated that the charge of accessory after the fact is based on transporting Tilghman from the scene:

> "He's charged with accessory after the fact. The accessory after the fact being the specific act of transporting Kent Tilghman from the scene not, not, and let's make this very very clear because this is very important—not, not calling the police, not, not turning Kent Tilghman in later, not none of that. That is not what the charge is, and frankly, again, I don't know why that charge wasn't brought either.... They brought a specific charge of accessory after the fact, transporting Kent Tilghman from the scene."

Defense counsel's argument seemed to recognize that the accessory-after-the-fact charge was a separate but not mutually exclusive offense.

 Furthermore, in her closing argument the prosecutor described an accessory after the fact as "someone who after the felony crimes are committed knowing the felony crimes are committed helps the person who committed the crime get out of there to avoid detection." This statement also does not imply mutual exclusivity between the crime of accessory after the fact and aiding and abetting in the attack on Hudson. Although the jury may have been somewhat confused by the prosecutor's remarks that accessory after the fact is "sort of an alternative crime" and that a "getaway driver is not an accessory after the fact," these comments fail to establish that the jury necessarily found as a fact that Butler did not aid and abet Tilghman in the offenses against Hudson.[6]

---

6. The prosecutor's opening statement also failed to apprise the jury that an accessory-after-the-fact conviction precluded any additional criminal complicity. The Assistant State's Attorney said the following:

■ Moreover, in considering counsel's *arguments*, the jury certainly would have given more credence to the judge's *instruction* that "[t]he guilt or innocence of a defendant as to each individual count should not control or influence your finding of guilt or innocence on some other count." We ought not assume that the jury is guided on the law by each word spoken by counsel, especially if there is a discrepancy between the judge's instructions and counsel's arguments. *See, e.g., Davis v. State,* 333 Md. 27, 52, 633 A.2d 867, 879 (1993) (presuming that a judge's instruction to the jury on a permissible inference will be weighed more heavily than counsel's reference to that inference in closing arguments); *Lattisaw v. State,* 329 Md. 339, 347, 619 A.2d 548, 552 (1993) (" ' "[T]he influence of the trial judge on the jury is necessarily and properly of great weight," and jurors are ever watchful of the words that fall from him.' " (quoting *Bollenbach v. United States,* 326 U.S. 607, 612, 66 S.Ct. 402, 405, 90 L.Ed. 350, 354 (1946), in turn quoting *Starr v. United States,* 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed. 841, 846 (1894))). In fact, the judge in this case specifically instructed the jury that, "it is my instructions to you concerning the law that are binding and not the comments that counsel for either side might want to make concerning the law."

■ We reiterate that Butler bears the burden of proving that the jury made a clear factual finding that he was not an aider or abettor to the shooting of Hudson. *See Dowling,* 493

---

"Michael Butler was there when Kent Tilghman fired the shots. Michael Butler took Kent Tilghman as quickly away from the scene as he possibly could. * * * The defendant [in a taped statement] basically admits to being an accessory after the fact to the crime. He admits in this tape to being there. To seeing the shooting. To seeing the handgun in Kent Tilghman's hand. To taking Tilghman away from the scene. Not turning Kent Tilghman in and not turning himself in.... *[B]ut Michael Butler is guilty of a lot more than simply being an accessory after the fact to the murder and assault with intent to murder....* As an accomplice he is just as guilty of premeditated first degree murder as Kent Tilghman would be." (Emphasis added).

The implication from this statement is that Butler is guilty of being an accessory after the fact, *and* he is also guilty of the other offenses.

U.S. at 350, 110 S.Ct. at 673, 107 L.Ed.2d at 719. If the court is uncertain as to what unstated, implied factual findings the jury made, the defendant has not met the burden of proof. As Judge Moylan so aptly stated,

> "[w]hen, therefore, the circumstances themselves are too ambiguous or the record itself too inadequate to permit an accurate assessment of what factual findings the jury must have made, it is the defendant, as [the] moving party, who necessarily loses."

*Butler*, 91 Md.App. at 545, 605 A.2d at 200. This is one of those relatively rare instances where a tie goes to the State.

A defendant does not meet the burden of proof by assuming that the jury made an irrational finding. We should assume that the jurors acted rationally and were logical in their decision. *See Ferrell*, 318 Md. at 251, 567 A.2d at 945 (noting the "assumption of jury rationality"). Therefore, the fact that the jury specifically told the judge it was deadlocked on all charges involving the attack on Hudson, although not dispositive, should be considered as at least some indication that it did not acquit Butler of being an aider and abettor in that attack.

Butler suggests that this Court's prior decisions preclude our giving any weight at all to the jury's failure to agree on a verdict on the hung counts. In *Powers*, we stated the following:

> "In Maryland, a mistrial is equivalent to no trial at all. It is not a final determination and decides no question of fact. Accordingly, a jury's failure to agree, which results in a mistrial, does not establish any facts, and thus cannot establish facts inconsistent with those established by its verdicts of acquittal." (Citation omitted).

285 Md. at 285, 401 A.2d at 1040. More recently in *Ferrell*, we expressed a similar belief and acknowledged that "it is logical to focus upon the counts where the jury reached verdicts rather than upon counts representing no decision and establishing nothing." 318 Md. at 255, 567 A.2d at 947. In both cases, we recognized that some courts have held that

collateral estoppel is inapplicable when the jury reaches a verdict on one count of a multi-count indictment and is unable to agree on another count having a common issue of ultimate fact. *See Ferrell,* 318 Md. at 256 n. 9, 567 A.2d at 948 n. 9; *Powers,* 285 Md. at 284–85, 401 A.2d at 1040. Declining to follow those courts, we held collateral estoppel should still apply notwithstanding that the jury's findings of fact might appear inconsistent.

Butler reads these cases too broadly. *Powers* and *Ferrell* emphasized that a court's focus must be on what factual determinations necessarily resulted from the counts on which the jury acquitted. If an acquittal on a particular count necessarily decided an issue of ultimate fact in the defendant's favor, then that finding is controlling notwithstanding any unresolved counts which also involved that same fact. *Ferrell,* 318 Md. at 254–55, 567 A.2d at 947; *Powers,* 285 Md. at 285–88, 401 A.2d at 1040–42. *Powers* and *Ferrell* did not, however, preclude a court from ever giving any consideration to a jury's failure to agree on counts when a court has to determine whether those counts were factually resolved by the jury's acquittal or conviction on other counts.

In cases such as the instant one, where there are no clear common issues of ultimate fact between the resolved and unresolved counts and where a court must attempt to ascertain what factual findings the jury made by using factors like ambiguous jury instructions and possibly confusing arguments of counsel, a court ought to consider all relevant aspects of the trial and not totally ignore the jury's indication that they were unable to resolve the disputed counts.

In *Ashe v. Swenson, supra,* the Supreme Court indicated the approach a court should take to collateral estoppel issues:

"[T]his approach requires a court to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and *other relevant matter,* and conclude whether a rational jury could have grounded its verdict

upon an issue other than that which the defendant seeks to foreclose from consideration.'" (Emphasis added).

397 U.S. at 444, 90 S.Ct. at 1194, 25 L.Ed.2d at 475–76 (quoting Daniel K. Mayers & Fletcher L. Yarbrough, Bis Vexari: *New Trials and Successive Prosecutions,* 74 Harv. L.Rev. 1, 38–39 (1960) (emphasis added)). Where it is clear what facts a jury resolved by its verdict of not guilty, then the jury's inability to agree on another count with common issues has no significance when balanced against the facts found by the jury based on its acquittal. As we said in *Powers v. State:*

"In our view, there can be no inconsistency in a jury's findings of fact when it acquits on one count and is unable to agree on another count having a common issue of ultimate fact, which if found in favor of an accused would establish his innocence on both counts. In Maryland, a mistrial is equivalent to no trial at all. *Cook v. State,* 281 Md. 665, 671, 381 A.2d 671, 674 (1978). It is not a final determination and decides no question of fact. Accordingly, a jury's failure to agree, which results in a mistrial, does not establish any facts, and thus cannot establish facts inconsistent with those established by its verdicts of acquittal. *United States v. Smith,* 337 A.2d [499,] 503–04 [ (D.C.1975) ] (Kern, J., concurring)."

285 Md. at 285, 401 A.2d at 1040.

Similar language was used in *Ferrell v. State,* 318 Md. at 254–55, 567 A.2d at 947. Both of these cases involved factual findings where juries acquitted on one or more counts of multi-count indictments, and were unable to agree on disputed counts. Obviously, there were clear factual findings established by the acquittals which were not undermined by the jurors' inability to agree on counts with common factual issues. Here, however, we are attempting to ascertain whether the jurors, by convicting the defendant on one count, in effect made a factual finding that the defendant was not guilty of counts that they told the court they were unable to agree upon. In determining what factual findings the jury made by its *conviction* of being an accessory after the fact, we should

look at all aspects of the trial including such things as the testimony and evidence in the trial, the instructions of the court, the arguments of counsel, and we should not totally ignore the jurors' communication that they were unable to agree on the disputed counts. *See Butler,* 91 Md.App. at 548, 605 A.2d at 202 (expressing the belief that, notwithstanding *Powers* and *Ferrell,* hung counts may lend "substantial circumstantial insight into what [the] jury probably did and probably did not decide"); *see also Clark,* 613 F.2d at 402 (recognizing that the jury's failure to agree may "enlighten[ ]" the court in its examination of a collateral estoppel challenge).

 Butler may have proven that the instructions and arguments were rather confusing, perhaps even contradictory. He failed, however, to prove his assertion that, based on the facts, the instructions, and the arguments of counsel, the jury *found as a fact* that he was not guilty of being an aider and abettor in the shooting of Sharrell Hudson merely because they convicted him of being an accessory after the fact in the murder of Sherman Chenault.

Finally, Butler contends that, even if the accessory-after-the-fact conviction does not preclude a retrial, the State is at least prohibited from retrying him on some of the counts pertaining to the attack on Hudson because of the impact of his second degree murder acquittal. At the hearing on his motion to dismiss and in the Court of Special Appeals, Butler focused almost exclusively on the collateral estoppel effect of his accessory-after-the-fact conviction. At oral argument before this Court, the acquittal of the second degree murder of Chenault was never even mentioned. In fact, Butler's only references to the acquittal were in a footnote in his brief and a footnote in his petition for certiorari. In those footnotes, Butler contended that, by acquitting him of the second degree murder of Chenault, the jury implicitly determined that he "did not intend to kill Chenault or Hudson." Therefore, Butler submits, a second prosecution is precluded on the counts charging assault with intent to murder Hudson and use

of a handgun in that felonious assault. Perhaps the limited amount of time and space devoted to this contention by counsel is an implicit recognition of its merit.

The trial judge's initial instructions on the crimes charged did not include any instruction on second degree murder. Upon notification by counsel of his failure to give such an instruction, the trial judge explained to the jury that "[m]urder in the second degree is the unlawful killing of a human being with malice *but without premeditation and deliberation.*" (Emphasis added). In its closing argument, the State contended that "everyone will submit in this case that what we truly have here is *not* the impulse murder that would be second degree murder but both theories of first degree premeditated murder." (Emphasis added). The State continued to argue about the premeditated and deliberate nature of the shooting, and maintained that "[t]here's no evidence that this was anything other than complete assassination." The State further contended, "there was no anger [and] no heat of passion...." Moreover, defense counsel submitted that "Hudson was the victim of an assault with the intent to murder, no question, no question," that "Chenault was murdered, first degree murder, willful, deliberate, premeditated, no question about that," and that this case involved a "drug assassination." The defense, of course, attributed these crimes solely to Kent Tilghman.

The State made various points in its closing argument to support its theory that Butler was a part of the "assassination" plan, including, *inter alia,* the following: (1) Hudson's testimony that Butler and Tilghman spent time alone together when Chenault was in the bathroom; (2) Hudson's testimony that Butler already had Tilghman's car keys in his pocket when Tilghman asked Butler to retrieve them from upstairs; (3) the inference that the yellow bag containing the money was in the Celica being driven by Butler, and that only a trusted accomplice would be permitted to drive that car; (4) the only definite connection to Owen Brown in the case was the fact

that Butler had been there at one time; [7] (5) testimony by two Owen Brown residents who heard a car speed off immediately after the shots were fired, which supported the State's theory that Butler was willingly waiting to whisk Tilghman away from the scene of the incident; and (6) McGrath's testimony that Butler admitted to being a murderer. The State submitted to the jury that "Butler was very much a part of the plan...." Furthermore, defense counsel conceded that Tilghman "had a plan. He knew exactly what he was going to do." Defense counsel, however, contended that Butler was not a part of Tilghman's plan, but that Butler was merely an innocent participant who drove Tilghman away from the scene of the crime under duress.

Thus, a realistic review of the record indicates that, by acquitting Butler of second degree murder, the jury did not *necessarily* find that Butler had no intent to kill Hudson. It is possible that the jury found that Tilghman's shooting of Chenault was clearly first degree premeditated murder, not second degree murder, and hung on whether Butler aided and abetted that first degree premeditated murder. The judge's instructions and the parties' closing arguments appeared to rule out a second degree murder conviction. The prosecution and the defense agreed that this case had nothing to do with second degree murder. In light of the judge's instruction that second degree murder does not involve premeditation or deliberation and the instruction that each count must be weighed separately, the acquittal of the second degree murder of Chenault is not inconsistent with a finding that there was a premeditated and deliberate plan to kill Hudson and Chenault to obtain the large sum of money. Whether Butler knowingly participated in that plan as contended by the State, or wheth-

---

7. Although Chenault and Hudson were told that Milton Tilghman, Kent's brother and the apparent drug source, lived in Columbia, "[e]xtensive records checks by the Howard County police ... turned up no connection of any sort between anyone named Milton Tilghman and the town of Columbia or any other location in its vicinity. There was a Milton Tilghman, on the other hand, living in Baltimore." *Butler,* 91 Md.App. at 521–22, 605 A.2d at 189.

er he was an innocent participant as argued by Butler, was not *necessarily* determined. Thus, the acquittal of the second degree murder of Chenault does not prohibit the State from retrying Butler on any of the counts pertaining to Hudson.

To apply collateral estoppel, we must analyze what the jury actually found based on the jury instructions that were actually given even if those instructions may have been inaccurate. We do not draw conclusions about what the jury found based upon a hypothetical set of instructions that the judge should have, but did not give to the jury. Although most forms of double jeopardy are concerned with the legal effect of the jury verdict, collateral estoppel is concerned with the precise factual findings made by the jury. In determining the jury's factual findings, we must look at how the trial judge instructed the jury. In the instant case, the jury was told specifically that a finding on any one count has no effect on any other count. The jurors were specifically told that second degree murder is a killing without premeditation and deliberation. Based on these instructions, the jurors could have drawn the erroneous conclusion that Butler was not guilty of second degree murder because the murder was committed with premeditation and deliberation although they were unable to resolve whether Butler aided and abetted that first degree murder. Although the legal double jeopardy effect of the acquittal of second degree murder was to bar prosecution for the first degree murder of Chenault, in applying collateral estoppel to the assault counts on Hudson, we are only concerned with the factual findings the jury actually made.

In light of the potentially misleading jury instructions, Judge Sybert did not err in concluding Butler failed to prove that the jury unanimously found he had no intent to kill Hudson. The legal effect of acquitting Butler of the second degree murder of Chenault was to acquit him of the first degree murder of Chenault, but that was not necessarily the factual finding made by the jury. When the jurors told the judge they were unable to decide whether Butler was guilty of the first degree murder of Chenault, they meant what they

said. They made no finding that Butler was not an aider and abettor in a premeditated and deliberate killing.[8]

### III.

Rephrasing the issue in the instant case, did Butler prove that the jury made a factual finding that he was not guilty of being an aider and abettor in the assault on Hudson? A realistic, rational, and nonhypertechnical reading of the record fails to establish that the jury made any such finding. Therefore, retrial may proceed on the unresolved counts concerning the attack on Sharrell Hudson.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.*

ELDRIDGE and BELL, JJ., dissent.

ELDRIDGE, Judge, dissenting.

I disagree with the majority's decision which permits the State to retry Michael Butler on the various counts relating to the shooting of Sharrell Hudson after a jury had earlier convicted Butler of being an accessory after the fact to the

---

**8.** In his dissent, Judge Eldridge asserts that, "[c]onsistent with the second degree murder acquittal, the jury likely determined that Butler did not aid or abet Tilghman in premeditated murder. The inability of the jury to agree on first degree murder, therefore, probably reflected the jury's difficulty with the State's alternate felony murder theory." *Butler v. State*, 335 Md. 238, 251, 643 A.2d 389, 395 (1994) (Eldridge, J., dissenting). He then acknowledges that in a series of written questions the jury tried to understand whether a guilty verdict for felony murder was possible. These questions culminated with the jury submitting, in writing, the following proposition to the judge:

"To make sure we understand you, the exchange of money from Sherman [Chenault] to Kent [Tilghman] with no force at the Butler's home, constitutes a theft and not a robbery and therefore, there could not be a felony murder conviction for Michael Butler."

Responding affirmatively, the judge wrote on the jury's note, "Yes—you are correct." Thus, based on the jurors' understanding that the evidence precluded a felony murder conviction, their inability to reach a verdict on first degree murder apparently reflected a failure to agree on whether Butler aided and abetted a premeditated first degree murder, rather than any "difficulty with the State's alternate felony murder theory."

murder of Sherman Chenault, acquitted him of second degree murder, and hung on the remaining counts. In light of the evidence, the jury instructions, and the closing arguments, Butler's conviction as an accessory after the fact to murder represented a determination that Butler was not a principal in any of the crimes charged. Therefore, under the collateral estoppel principles set forth by this Court in *Ferrell v. State,* 318 Md. 235, 567 A.2d 937, *cert. denied,* 497 U.S. 1038, 110 S.Ct. 3301, 111 L.Ed.2d 810 (1990); *Grant v. State,* 318 Md. 672, 569 A.2d 1237 (1990); and *Powers v. State,* 285 Md. 269, 401 A.2d 1031, *cert. denied,* 444 U.S. 937, 100 S.Ct. 288, 62 L.Ed.2d 197 (1979), the State should be precluded from retrying Butler on the counts relating to Hudson.

As the majority points out, collateral estoppel is a component of the Fifth Amendment double jeopardy prohibition as well as a recognized principle under Maryland common law. *Dowling v. United States,* 493 U.S. 342, 347, 110 S.Ct. 668, 671–672, 107 L.Ed.2d 708, 717 (1990); *Ashe v. Swenson,* 397 U.S. 436, 445–446, 90 S.Ct. 1189, 1195, 25 L.Ed.2d 469, 476–477 (1970); *Gibson v. State,* 328 Md. 687, 693, 616 A.2d 877, 880 (1992); *State v. Anderson,* 320 Md. 17, 29, 575 A.2d 1227, 1232–1233 (1990); *Ferrell v. State, supra,* 318 Md. at 241, 567 A.2d at 940; *Bowling v. State,* 298 Md. 396, 401, 470 A.2d 797, 799–800 (1984); *Carbaugh v. State,* 294 Md. 323, 329, 449 A.2d 1153, 1156 (1982); *Powers v. State, supra,* 285 Md. at 283–284, 401 A.2d at 1039. The doctrine provides that " 'when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.' " *Dowling v. United States, supra,* 493 U.S. at 347, 110 S.Ct. at 672, 107 L.Ed.2d at 717, quoting *Ashe v. Swenson, supra,* 397 U.S. at 443, 90 S.Ct. at 1194, 25 L.Ed.2d at 475. *See Gibson v. State, supra,* 328 Md. at 693, 616 A.2d at 880; *Apostoledes v. State,* 323 Md. 456, 463–464, 593 A.2d 1117, 1121 (1991); *Ferrell v. State, supra,* 318 Md. at 241, 567 A.2d at 940. The burden is on the party asserting collateral estoppel to show that "the issue whose relitigation he seeks to foreclose was actually decided in the

first proceeding." *Dowling v. United States, supra,* 493 U.S. at 350, 110 S.Ct. at 673, 107 L.Ed.2d at 719.

The issue of ultimate fact which Butler contends was resolved at his trial is the role that he played in the shooting of Chenault and Hudson. Butler argues that his conviction as an accessory after the fact to the murder of Chenault represented a jury determination that he was not a principal in any of the crimes for which he was tried. Butler relies upon the mutual exclusivity of being an accessory after the fact to murder and a principal in the first or second degree to murder as the basis for his collateral estoppel challenge. In support of his argument, Butler cites *Grant v. State, supra,* 318 Md. 672, 569 A.2d 1237, for the principle that collateral estoppel can be predicated upon a guilty verdict as to one crime, which, because of the doctrine of mutual exclusivity, operates as a not guilty determination as to another crime.

In *Grant,* the defendant had been convicted in Baltimore City, upon an *Alford* [1] plea, of theft based on his possession of stolen goods. The State's theory was that he was the receiver of the stolen goods. Shortly thereafter, the defendant was convicted in Baltimore County of storehouse breaking with intent to steal the very same goods which were the basis of his earlier conviction. The storehouse breaking had occurred in Baltimore County. At the trial on the storehouse breaking charge, the only evidence offered to prove Grant's criminal agency was the fact that he had been found in exclusive possession of the stolen goods. From this fact the jury could have inferred that Grant was the thief. Upon further proof that the goods were stolen as the result of the breaking, the jury could have inferred that Grant was involved in the storehouse breaking. This Court reversed Grant's storehouse breaking conviction on collateral estoppel grounds. We pointed out that, both at common law and under the theft offense statute, a person may not be both the receiver of the stolen

---

1. *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970).

goods and the person who stole them.[2] We then held that, under collateral estoppel principles, the Baltimore City "adjudication" that Grant was the receiver of the goods "precluded a subsequent finding that Grant was the person who stole the goods." *Grant,* 318 Md. at 679–680, 569 A.2d at 1240–1241. Thus, the inference that Grant had been the thief was unavailable to the State as evidence that Grant was guilty of breaking, and the State had no other proof that he was involved in the breaking.

The majority agrees that, under the teaching of *Grant,* and Maryland law prior to *State v. Hawkins,* 326 Md. 270, 604 A.2d 489 (1992),[3] the adjudication that Butler was an accessory after the fact to the murder of Chenault precluded a subsequent finding that he was guilty of murdering Chenault. The majority, however, does not interpret *Grant* to preclude retrial on the counts relating to Hudson. Rather the majority concludes that "*Grant* only precludes the State from drawing two totally inconsistent factual inferences from the same item of evidence, *i.e.,* being found in possession of stolen goods." This interpretation of *Grant* is unduly restrictive. What *Grant* precluded was a conviction for storehouse breaking based on a finding that would be inconsistent with the earlier Baltimore

---

**2.** We stated in *Grant,* 318 Md. at 678–680, 569 A.2d at 1239–1240, that the common law rule that one may not be both the receiver of stolen goods and the thief applied under the consolidated theft offense statute, Maryland Code (1957, 1992 Repl.Vol., 1993 Cum.Supp.), Article 27, §§ 340, *et seq. See Rice v. State,* 311 Md. 116, 135, 532 A.2d 1357, 1366 (1987) ("Rice could not have both stolen the ... property and possessed it as stolen property").

**3.** As the majority points out, this case was tried before our decision in *State v. Hawkins,* 326 Md. 270, 604 A.2d 489 (1992), in which we prospectively changed the longstanding common law requirement that an accessory after the fact to a crime may not be a principal in the crime. Were *Hawkins* applicable to the present case, there is no question that collateral estoppel principles would not preclude the reprosecution on the hung counts. Under *Hawkins,* Butler could be convicted as both an accessory after the fact and as a principal in the second degree to the same crime; he simply could not be sentenced for both offenses. Since, however, this case predates the application of the *Hawkins* case, the former requirement that an accessory after the fact cannot be a principal is applicable.

City adjudication. Since the State could only gain a conviction by relying on the inference that, because Grant possessed the stolen goods, he was the thief, and since this inference was inconsistent with the determination that Grant was the receiver, the conviction was overturned. Had the State been able to produce other evidence of Grant's participation in the storehouse breaking, there would have been no conflict between the two convictions.

Application of the holding in *Grant* to the facts of the case at bar would indicate that a retrial on the counts concerning Hudson is barred because the State's evidence demonstrated that Butler performed the same role in the shootings of both Chenault and Hudson. The evidence disclosed that Butler was parked on a road outside the parking lot when the shootings occurred. Although Hudson never saw a gun, she believed that Tilghman alone had been the shooter. There was no evidence that two guns or two shooters were involved. Nor was there any physical evidence to connect Butler to the shootings. Moreover, the shootings occurred in rapid succession. Even had Butler decided to assist Tilghman after Chenault was shot, there was no time for him to enter the parking lot and aid in the shooting of Hudson.[4] The record was completely devoid of any evidence that Butler assumed different roles in the shootings. Thus, when the jury convicted Butler as an accessory after the fact to murder, it necessarily decided that Butler was not a principal with respect to all of Tilghman's crimes that night against Chenault and Hudson.

Even if the majority were correct in its interpretation of *Grant*, the principles set forth in *Ashe v. Swenson, supra*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469, would still preclude the State from retrying Butler. In *Ashe*, the defendant had been acquitted of the robbery of one of six poker players in a trial where the sole issue was identity of the robbers. Subse-

---

**4.** It is more likely that the reverse would have been true. The facts indicate that Hudson played no part in the purported drug deal and was innocently accompanying Chenault on the night of the murder. Any murder/robbery plan would have likely been directed at Chenault who was the drug buyer and in possession of a great deal of money.

quently, the State retried and a jury convicted Ashe for the robbery of another of the poker players. The Supreme Court reversed the conviction on collateral estoppel grounds, pointing out that "[t]he situation is constitutionally no different here, even though the second trial related to another victim of the same robbery." 397 U.S. at 446, 90 S.Ct. at 1196, 25 L.Ed.2d at 477. *Ashe* involved the same crime but a different victim. In the present case, the crimes for which Butler was charged, murder and assault with intent to kill, are technically different but only because Chenault died from his wounds and Hudson did not. The conduct of the defendant was, however, the same with respect to both victims, just as the alleged conduct of Ashe was the same with respect to all of his supposed victims. Thus, once the jury convicted Butler as an accessory after the fact to murder, as a matter of law, Butler could not have been guilty of being a principal to Chenault's murder. Furthermore, since the conduct as to both victims was identical, under the principles in *Ashe*, Butler could not be a principal in the shooting of Hudson.

Other jury actions support this conclusion. Specifically, the acquittal on second degree murder indicates the jury's belief that Butler neither shot Chenault himself nor aided and abetted Tilghman in the shooting of Chenault. Consistent with the second degree murder acquittal, the jury likely determined that Butler did not aid or abet Tilghman in premeditated murder. The inability of the jury to agree on first degree murder, therefore, probably reflected the jury's difficulty with the State's alternate felony murder theory.[5] Apparently the jury had questions as to whether a robbery had ever occurred, and if it had, whether it had taken place at

---

5. The Court of Special Appeals acknowledged that the acquittal on second degree murder and the hung jury on first degree murder implied that the jury believed only that Butler may have intended to rob Chenault and not murder him. 91 Md.App. at 547, 605 A.2d at 201–202. According to the intermediate appellate court, "[t]he verdicts also imply that the jury may have had more trouble with the subtler notion that a participant in an underlying felony can nonetheless be responsible for a resultant murder even if he did not intend it." 91 Md.App. at 547, 605 A.2d at 202.

Waning Moon Way. In a series of questions to the trial judge, the jury tried to understand what crimes had occurred and whether those crimes could form the basis of a felony murder conviction. The jury first asked:

"If person A and person B agree to exchange property (e.g., a purchase of drugs for money) and person B pays person A the agreed sum of money and then person A murders person B prior to delivering the agreed property and keeps the money, has person A committed robbery?"

The trial court responded that "[p]erson A has not committed a robbery. Person A has committed a theft." At the jury's prompting, the trial court also explained that a co-felon to a theft or a drug transaction would not be guilty of felony murder should a murder occur during the course of these crimes. The jury pressed the trial court further for clarification on this point:

"To make sure we understand you, the exchange of money from Sherman [Chenault] to Kent Tilghman with no force at the Butler's home, constitutes a theft and not a robbery, and therefore, there could not be a felony murder conviction for Michael Butler."

The trial court responded affirmatively.

These and other questions asked by the jury did not indicate that the jury was confused about whether an accessory after the fact to murder could also be an aider and abettor; rather they indicated jury preoccupation with theft and robbery. The jury seemed to believe that Butler may have aided and abetted in a theft or robbery, but it also seemed to be of the view that the theft or robbery, if any occurred, transpired at the Butler home and not at Waning Moon Way.

The majority asserts that "[w]here, as in the instant case, the jury is not clearly instructed to the contrary, a person could be factually guilty of being a principal in the second degree by aiding and abetting as well as guilty of being an

accessory after the fact." [6] The majority cites *State v. Haw-kins*, 326 Md. 270, 604 A.2d 489 (1992) for this proposition. In *Hawkins*, however, the instructions regarding the crime of accessory after the fact neither explicitly nor implicitly con-veyed to the jury that being a principal and an accessory after the fact were mutually exclusive crimes.[7] An examination of the record in this case discloses that the jury was clearly informed that Butler could not be both an accessory after the

---

**6.** The majority speaks in terms of "factual guilt," almost as if the mutually exclusive offenses of being an accessory after the fact and an aider and abettor are different from other mutually exclusive offenses. Such is not the case. An element of being an accessory after the fact to a crime is that one did not aid and abet the crime. Likewise, an element of "receiving" stolen goods is that one was not the thief. While it may be true that, in the abstract, one can both participate in a crime and drive the perpetrator from the scene of that crime, just as one could steal goods and then "receive" them from himself or just as one could attempt a crime as well as consummate it, nevertheless crimes are defined by their elements. The facts are relevant only inasmuch as they show the presence of the elements of a crime. Accordingly, if an element of a crime specifies that a person cannot have committed another act, then, regardless of whether it is "factual-ly" possible to perpetrate both acts, that person can be found guilty of only one of the crimes. To suggest that Butler can be "factually guilty" of being both an accessory after the fact and an aider and abettor to the same crime is analogous to saying that a person who breaks into and enters a dwelling house in the daytime with a felonious intent is guilty of common law burglary; it requires the majority to ignore a crucial element of the crime. Only if the elements of being an accessory after the fact were changed in such a way that they were no longer mutually exclusive, such as occurred in *State v. Hawkins*, 326 Md. 270, 604 A.2d 489 (1992), could one be "factually guilty" of being an accessory after the fact and a principal. As we have indicated, however, this case is being decided under pre-*Hawkins* law. Thus, it is no more "hypertech-nical" to preclude retrial in the case at bar than it was in *Grant, supra*, 318 Md. 672, 569 A.2d 1237.

**7.** In *Hawkins*, the trial judge instructed the jury as follows:
"An accessory after the fact is a person who, with knowledge that a crime has been committed, assists the offender with the intent to hinder or prevent the offender's arrest, prosecution, or trial. In order to convict the defendant, the State must prove: one, that the crime of murder has been committed; two, that the defendant knew that the crime of murder had been committed; three, that the defendant gave assistance to the person who committed the crime; and four, that the defendant did so with the intent to hinder or prevent that person's arrest, prosecution or trial."

fact to murder and a principal in either the first or second degree to the murder. In the jury instructions in this case, the trial judge defined an accessory after the fact as

"a person [who] with knowledge that a crime has been committed assists the offender by transporting him from the scene of the crime. In order to be guilty of this crime: One, *the defendant must have become associated with the felony after its commission;* two, the defendant must have provided assistance with knowledge that the felony had been completed; three, the assistance must have been given to one known to be the felon; and four, the assistance must have been given in order to hinder the felon's apprehension by transporting him from the scene.

"The term 'knowledge' means that at that time the relief or assistance was given, the defendant must have had actual knowledge that the person assisted was the one who committed the felony. . . .

"In order for the defendant to be convicted as an accessory after the fact, the State must prove beyond a reasonable doubt each of the elements of the underlying crime including that the crime was committed by someone other than the defendant." (Emphasis added).

Although the instructions did not expressly inform the jurors that being an accessory after the fact to murder and a principal to murder are mutually exclusive, the clear and unmistakable impression is that an accessory after the fact is one whose affiliation with the crime begins only after the crime has been completed. A person who assisted in the crime itself and who also drove the perpetrator from the scene of the crime would not, under the above-quoted instructions, be an accessory after the fact.

Both the prosecuting attorney and the defense attorney also spoke to the mutual exclusivity of the two crimes. In her closing argument, the prosecuting attorney stated that "[t]o make this plan work there had to be a getaway driver. There had to be a reliable getaway driver. There had to be a

lookout.... The getaway driver is not an accessory after the fact." Later she commented:

> "The defendant is charged in this case with sort of an *alternative* crime, I must admit. It's ... called accessory after the fact, *and that is not a getaway driver as I said before.* That is someone who *after* the felony crimes are committed, knowing the felony crimes are committed, helps the person who committed the crime get out of there to avoid detection." (Emphasis added).

The defense attorney, in his closing argument, further reinforced the notion of the mutual exclusivity of being an accessory after the fact to murder and being a principal:

> "And as Ms. O'Donnell said, the government has put before you a remaining count, accessory after the fact.... They put that count before you because they said, well, if you don't believe that he's the murderer, if you don't believe that he assaulted her with intent to murder her, if you don't believe that he used a handgun, if you don't believe he was the accomplice, if you don't believe any of that, at least he drove [him] away.... At least he drove Kent Tilghman from the scene, so he's an accessory after the fact. So they throw it on at the end. So they said so we can try to get him for something."

In finding the jury instructions inadequate, the majority asserts that the trial judge's instruction to consider each count separately gave the jurors the impression that "they could find Butler guilty of aiding and abetting in the assaults and also guilty of being an accessory after the fact to murder." These instructions, however, are routinely given whenever a defendant is charged with multiple counts. *See* David E. Aronson, *Maryland Criminal Jury Instructions and Commentary* 110 (2d ed. 1988); *Maryland Criminal Pattern Jury Instructions* 3:06, at 40–41 (1991). They do not apply to situations where the crimes are, in light of their elements, mutually exclusive. Under this reasoning, any time a jury receives a similar instruction, it could feel free to disregard elements of the

crimes when there is a relationship between offenses charged in different counts.

By deeming inadequate the jury instructions given in this case, the majority seems to be requiring that all jury instructions in criminal cases be perfect and that they be given with 100% completeness and clarity. Such a requirement can only result in a proliferation of challenges to otherwise acceptable jury instructions. If Butler had objected to the accessory instructions and had appealed his accessory after the fact conviction, the majority opinion implies that the conviction would be reversed. I would not agree.

The majority further asserts that the jury's being "deadlocked on all charges involving the attack on Hudson ... should be considered as at least some indication that it did not acquit Butler of being an aider and abettor in that attack." In *Powers v. State, supra,* we explained the relationship between the jury's inability to resolve one count and its verdict on another count, when the verdict and the count on which the jury had hung shared issues of ultimate fact (285 Md. at 285, 401 A.2d at 1040):

"In our view, there can be no inconsistency in a jury's findings of fact when it acquits on one count and is unable to agree on another count having a common issue of ultimate fact, which if found in favor of an accused would establish his innocence on both counts. In Maryland, a mistrial is equivalent to no trial at all. *Cook v. State,* 281 Md. 665, 671, 381 A.2d 671, 674 (1978). It is not a final determination and decides no question of fact. Accordingly, a jury's failure to agree, which results in a mistrial, does not establish any facts, and thus cannot establish facts inconsistent with those established by its verdicts of acquittal. *United States v. Smith,* 337 A.2d [499] at 503–04 [1975] (Kern, J., concurring)."

We reaffirmed this principle in *Ferrell v. State, supra,* where we made clear that the focus, for purposes of applying the doctrine of collateral estoppel, must be upon the count on which the jury had returned a verdict, "with that [verdict]

being viewed as a rational resolution of the underlying facts." 318 Md. at 254–255, 567 A.2d at 947. The majority attempts to distinguish *Powers* and *Ferrell* on the basis that those cases involved an acquittal on a count that shared a common issue with the counts unresolved by the jury, whereas, the instant case focuses on whether there were common issues among various counts which were resolved by the defendant's conviction on a particular count. In *Ferrell* we pointed out that "it is logical to focus upon the counts where the jury reached verdicts rather than upon counts representing no decision and establishing nothing." 318 Md. at 255, 567 A.2d at 947. Thus, although in *Ferrell,* the jury acquitted the defendant on one count, we made. clear that it was the counts which the jury resolved, whether by acquittal or conviction, that would be the touchstone of collateral estoppel analysis.

A "rational and reasonable" reading of the record in this case confirms that the jury's verdict on the accessory after the fact charge represented a determination that Butler was not an aider and abettor in the killing of Chenault. In light of the record, this verdict also represented a determination that Butler was not a principal in the crimes against Hudson.

Judge BELL has authorized me to state that he concurs with the views expressed herein.